[L.A. No. 31861. Feb. 28, 1985.]

HUNTINGTON PARK REDEVELOPMENT AGENCY, Petitioner, v. MICHAEL A. MARTIN, as Secretary, etc., Respondent.

**COUNSEL**

Michael B. Montgomery, James Warren Beebe, John G. Perenchio, Kindel & Anderson and Steven P. Rice for Petitioner.

Jones, Hall, Hill & White, Robert G. Auwbrey, Helm, Budinger & Lemieux, Wayne K. Lemieux, Steven H. Goldfarb, Lee C. Rosenthal, Goldfarb & Lipman, Joseph E. Coomes, Jr., T. Brent Hawkins, McDonough, Holland & Allen, Thomas P. Clark, Jr., David R. McEwen, Stradling, Yocca, Carlson & Rauth, Herbert M. Weiser, James Dexter Clark, Weiser, Kane, Ballmer & Berkman, Richards, Watson, Dreyfuss & Gershon, Steven L. Dorsey and Rochelle Browne as Amici Curiae on behalf of Petitioner.

Charles R. Martin for Respondent.

**OPINION**

**MOSK, J.**—This is a petition for writ of mandate to compel respondent Martin, Secretary of the Huntington Park Redevelopment Agency (the

Agency), to publish an ordinance adopted by the Agency on August 24, 1982. The ordinance would allow the Agency to levy a sales and use tax. Martin refused to publish the ordinance on the ground that it assertedly violates section 4 of article XIII A, and article XIII B, of the California Constitution.

■ Redevelopment agencies are governed by the Community Redevelopment Law. (Health & Saf. Code, § 33000 et seq.) As arms of local legislative bodies, they act on the local level to eradicate blighted areas. To accomplish this goal, these agencies utilize tax-increment financing, authorized by article XVI, section 16, of the Constitution. Under this scheme, the agency borrows funds and issues bonds to finance a project. The intent is that on completion of the project the property values in the area—and hence property tax revenues—will increase. These increased revenues are allocated between the agency and the taxing entity, the agency receiving only those revenues necessary to pay the costs of redevelopment, including repayment on the bonds. (*Redevelopment Agency* v. *County of San Bernardino* (1978) 21 Cal.3d 255, 257, 266 [145 Cal.Rptr. 886, 578 P.2d 133].)

In 1981 the Legislature enacted Senate Bill No. 152 (SB 152). (Stats. 1981, ch. 951, p. 3622.) By means of amendments and additions to the Revenue and Taxation Code and the Community Redevelopment Law, SB 152 provides redevelopment agencies with an additional mode of financing. A redevelopment agency may now impose a sales and use tax of 1 percent or less on retail sales and use of personal property, if the agency operates in a city that will give credit against its own sales and use tax for taxes paid to the agency. (Rev. & Tax. Code, §§ 7202.5, 7202.6.) Thus the burden on taxpayers will not increase, because they will obtain a dollar-for-dollar credit against their city taxes for any sums paid to such an agency. An agency is authorized to issue bonds to be paid off from the proceeds of this sales and use tax. (Health & Saf. Code, § 33641, subd. (d).)

On August 24, 1982, the Agency adopted an ordinance (the Ordinance) imposing a sales and use tax of 1 percent in conformity with SB 152. On the same day, the City of Huntington Park (the City) amended its municipal code to provide a tax credit against its sales and use taxes for any taxes paid to the Agency under the Ordinance. The tax will not become operative until the Ordinance is published. (Gov. Code, § 36933, subd. (b).) Respondent Martin has refused to publish the Ordinance, although it is his statutory duty to do so. (Rev. & Tax. Code, § 7202.6, subd. (b); Gov. Code, § 36933, subd. (a).)

The issues we confront are two: whether the Ordinance violates section 4 of article XIII A of the Constitution (requiring "special taxes" to be ap-

proved by two-thirds of the electors before they may be imposed); and whether the Ordinance violates article XIII B of the Constitution (limiting appropriations of the state and local governments to the past year's level). We conclude that the Ordinance does not fall within article XIII A because the Agency is not a "special district." Nor does the Ordinance violate article XIII B, as there has been a transfer of "the financial responsibility of providing services" from the City to the Agency, and thus the City and the Agency may adjust their appropriations limit accordingly.

## I. *The Challenge Under Article XIII A*

Article XIII A of the Constitution is the product of Proposition 13, a 1978 initiative aimed at reducing property taxes. Section 4 of that article provides that "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district . . . ." Although this section appears to be a grant of power allowing local entities to enact special taxes, it actually has the effect of limiting their enactment (*City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47, 53 [184 Cal.Rptr. 713, 648 P.2d 935]). While a majority of the voters may favor a proposal, they are likely to be thwarted by the requirement of attaining a two-thirds vote. The section is part of the "interlocking 'package'" of sections in article XIII A, "deemed necessary by the initiative's framers to assure effective real property tax relief." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281].) The purpose of section 4 is to prevent the government from recouping its losses from decreased property taxes by imposing or increasing other taxes. (*Ibid.*)

The Agency contends that the Ordinance does not violate section 4 even though it was not submitted to the voters for a two-thirds approval. First, the Agency contends it is not "imposing" a tax: because the taxpayers will have no additional tax burden, there is merely a transfer of tax revenues from one governmental entity to another. Second, the levy here is not a "special tax," as it is to be used for general redevelopment purposes. (See *City and County of San Francisco* v. *Farrell, supra,* 32 Cal.3d at p. 57.) Third, the Agency is not a "special district," as it does not have the power to levy a property tax. (See *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197, 205 [182 Cal.Rptr. 324, 643 P.2d 941].) We need consider only the last of these contentions, for as respondent concedes, an adverse holding on any of these grounds is fatal to his reliance on article XIII A. (See 31 Cal.3d at pp. 201-202: "if that term ["special district"] does not encompass [petitioner], the two-thirds requirement is

inapplicable to the sales tax in issue here even if it is a 'special tax' within the meaning of the section.'')

Section 4 applies to special taxes levied by "Cities, Counties and special districts." The Agency is not a city or county, and thus it will fall within section 4 only if it is a special district. We considered the meaning of the term "special district" in *Richmond*. Reasoning that section 4 was ambiguous, and "[i]n view of the fundamentally undemocratic nature of the requirement for an extraordinary majority," we concluded that "the language of section 4 must be strictly construed and ambiguities resolved in favor of permitting voters of cities, counties and 'special districts' to enact 'special taxes' by a majority rather than a two-thirds vote." (*Id.* at p. 205.) We therefore held that a special district for the purpose of section 4 is one "which may levy a tax on real property." (*Ibid.*)

 Redevelopment agencies are not empowered by law to levy property taxes; the tax collector of the county collects all such taxes. (Rev. & Tax. Code, § 2602.) Nor do redevelopment agencies in fact levy property taxes. Tax-increment financing uses taxes levied not by redevelopment agencies, but "levied and collected as other taxes are levied and collected by the respective taxing agencies." (Cal. Const., art. XVI, § 16.) Health and Safety Code section 33670, implementing and echoing the language of the latter provision, defines "taxing agencies" as "the State of California, any city, county, city and county, district, or other public corporation," and discusses allocation of revenues between these agencies on the one hand, and redevelopment agencies on the other.[1] Clearly, the scheme estab-

---

[1]Section 33670 provides that the taxes levied are to be divided as follows: "(a) *That portion of the taxes which would be produced by the rate upon which the tax is levied* each year by or for each of the taxing agencies upon the total sum of the assessed value of the taxable property in the redevelopment project as shown upon the assessment roll used in connection with the taxation of such property by such taxing agency, last equalized prior to the effective date of such ordinance, *shall be allocated to and when collected shall be paid to the respective taxing agencies* as taxes by or for said taxing agencies on all other property are paid (for the purpose of allocating taxes levied by or for any taxing agency or agencies which did not include the territory in a redevelopment project on the effective date of such ordinance but to which such territory has been annexed or otherwise included after such effective date, the assessment roll of the county last equalized on the effective date of the ordinance shall be used in determining the assessed valuation of the taxable property in the project on the effective date); and

"(b) *That portion of the levied taxes each year in excess of such amount shall be allocated to and when collected shall be paid into a special fund of the redevelopment agency* to pay the principal of and interest on loans, moneys advanced to, or indebtedness (whether funded, refunded, assumed, or otherwise) incurred by such redevelopment agency to finance or refinance, in whole or in part, such redevelopment project. Unless and until the total assessed valuation of the taxable property in a redevelopment project exceeds the total assessed value of the taxable property in such project as shown by the last equalized assessment roll referred to in subdivision (a), all of the taxes levied and collected upon the taxable property

lishes that redevelopment agencies passively receive the revenue from taxes levied by other agencies.

Respondent urges a different interpretation. While he acknowledges that a redevelopment agency does not have the power to levy taxes on real property, he contends that the agencies' indirect participation in the taxing process makes them "special districts": Although the agencies do not impose the taxes themselves, they receive a share of the taxes imposed—thus, they indirectly levy.

The argument is untenable. As explained in *Richmond,* we read section 4 narrowly because it impinges on the democratic process. (31 Cal.3d at p. 205.) To conclude that the "levying" of property taxes includes the passive receipt of revenues from such taxes is an expansion of that concept directly at odds with our mandated narrow reading of section 4. ▮ For purposes of section 4, the "levying" of a tax must mean just that: the imposition and collection of the tax.[2]

## II. *The Challenge Under Article XIII B*

Article XIII B of the Constitution was the result of Proposition 4, a 1979 initiative. Section 1 of that article provides that "The total annual appropriations subject to limitation of the state and of each local government shall not exceed the appropriations limit of such entity of government for the prior year . . . ." Section 8, subdivision (b), defines "appropriations subject to limitation" of an entity of local government as "any authorization to expend during a fiscal year the proceeds of taxes levied by or for that entity . . . ." Subdivision (c) of the same section defines "proceeds of taxes" to include revenues from licence and user fees in excess of the costs of regulation, investment of tax revenues, and subventions received by the local government from the state. Thus, a governmental entity may not spend more in one year on a program funded with the proceeds of taxes than it did in the prior year.

---

in such redevelopment project shall be paid to the respective taxing agencies. When such loans, advances, and indebtedness, if any, and interest thereon, have been paid, all moneys thereafter received from taxes upon the taxable property in such redevelopment project shall be paid to the respective taxing agencies as taxes on all other property are paid." (Italics added.)

[2]In addition, section 11 of SB 152 provides that "the State Board of Equalization shall not administer any sales tax imposed by a redevelopment agency pursuant to this act unless and until an appellate court makes a determination which is final on the merits that such a tax is not a 'special tax' within the meaning of Section 4 of Article XIII A of the California Constitution." Because we hold the Agency not to be a "special district," and thus not within the scope of section 4, such a determination need not be made in this case.

The Agency asserts, and respondent concedes, that it does not have an annual appropriations limit, because the revenues from tax-increment financing are not "proceeds of taxes" for the purposes of article XIII B.[3] The Agency concedes that the revenues raised by the Ordinance are the "proceeds of taxes." Since the Agency has no appropriations limit, any spending of the revenues it receives through the Ordinance could be in violation of article XIII B.

■ Section 3, subdivision (a), of article XIII B provides that if "the financial responsibility of providing services is transferred . . . from one entity of government to another, then for the year in which such transfer becomes effective the appropriations limit of the transferee entity shall be increased by such reasonable amount as the said entities shall mutually agree and the appropriations limit of the transferor entity shall be decreased by the same amount." The Agency urges us to hold that such a transfer has taken place in the present case. Respondent concedes that if such a transfer has taken place article XIII B will not be violated, but insists that nothing has been transferred here but the power to tax.

■ "Where the Legislature has enacted a law in light of a particular constitutional provision, a settled rule of construction is that the Legislature's interpretation of uncertain constitutional terms is entitled to great deference by the courts." (*Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656, 662 [166 Cal.Rptr. 674].) ■ Health and Safety Code section 33678 was enacted in the first legislative session following the adoption of article XIII B. It provides in part that if any law giving a redevelopment agency the power to tax is enacted without a vote of the electorate, the exercise of that taxing power will be deemed a "transfer of financial responsibility" within the meaning of section 3, subdivision (a). SB 152, section 3, subdivision (c), provides that the taxing power it creates in redevelopment agencies is such a transfer.[4]

That this transfer is consistent with article XIII B, section 3, subdivision (a), is easily demonstrated. ■ It is well recognized that elimination of urban blight is a governmental function. (*Pacific Tel. & Tel. Co.* v. *Rede-*

---

[3]Health and Safety Code section 33678, subdivision (a), declares the proceeds received from tax-increment financing to be outside article XIII B. We need not decide the validity of this section, as tax-increment financing is not at issue here, and we find there is a "transfer of financial responsibility" within the meaning of section 33678 and article XIII B, section 3, subdivision (a), discussed below. For the same reasons, we find it unnecessary to consider whether article XIII B applies to redevelopment agencies.

[4]Section 3, subdivision (c), was repealed effective January 1, 1984, before the Ordinance was enacted. (Stats. 1981, ch. 951, § 9, p. 3629.)

*velopment Agency* (1977) 75 Cal.App.3d 957, 969 [142 Cal.Rptr. 584]; Health & Saf. Code, § 33750.) ■■ In California, the Community Redevelopment Law recites specifically that it is a state policy to cure blighted areas. (*Id.*, § 33037.) Redevelopment agencies are created to fulfill this governmental function. (*Id.*, § 33703.) Thus, there is a transfer, in Huntington Park as elsewhere, from the City to the Agency of the City's responsibility for providing the service of eradicating urban blight.

Article XIII B, section 3, subdivision (a), allows a shifting of appropriations limits for the year in which the transfer becomes effective. It is true that the transfer here took place prior to the enactment of the Ordinance. However, the redevelopment scheme in California envisions not a static transfer of responsibility, but an ongoing balance of agency action and city oversight and participation. A city may create a redevelopment agency to perform the service of eradicating blight (Health & Saf. Code, § 33101), it may retain the power itself (*id.*, § 33200), or it may have a combination of both working together (*id.*, § 33210). The city has continuing control over the existence of the agency: the city must create the agency (*id.*, § 33101), may dissolve the agency (*id.*, § 33141), and must approve of the agency's plans (*id.*, § 33360). The agency partially funds the redevelopment. For example, Health and Safety Code section 33750 provides that "it is necessary and essential that redevelopment agencies be authorized to make long-term, low-interest loans through qualified mortgage lenders to finance residential construction in order to encourage investment and upgrade redevelopment project areas and increase the supply of housing. Unless redevelopment agencies intervene to generate mortgage funds and to provide some form of assistance to finance residential construction, many redevelopment areas will stagnate and deteriorate because owners and investors are not able to obtain loans from private sources. [¶] The Legislature further finds and declares that financing of rehabilitation . . . serves an essential public purpose for the economic renewal of our cities." Thus, there is a constant transfer of "financial responsibility for providing services." Here SB 152, and the Ordinance passed in conformity therewith, facilitate the flow of responsibility from the City to the Agency. The City may therefore pass a portion of its appropriations limit to the Agency in accordance with article XIII B, section 3, subdivision (a).

■■ This conclusion is further supported by analysis of the Ordinance in light of the purposes of article XIII B. Proposition 4, which became article XIII B, was billed by its supporters as the "Spirit of 13" (referring to Prop. 13, which had been adopted a year earlier as art. XIII A). Its goals were the "protection for taxpayers from excessive taxation," and the imposition of a "thoughtfully drafted spending limit" on government. (Ballot Pamp.,

Proposed Amends. to Cal. Const. with arguments to voters, Special State-wide Elec. (Nov. 6, 1979), argument in favor of Prop. 4, p. 18.) The initiative was thus aimed against excessive taxation and government spending. (*County of Placer* v. *Corin* (1980) 113 Cal.App.3d 443, 446 [170 Cal.Rptr. 232].)

But neither of these concerns is implicated here. A person will not pay increased sales and use taxes under an ordinance enacted pursuant to SB 152, as an agency may adopt such an ordinance only if the city in which it operates provides a dollar-for-dollar credit against its own sales and use tax. And government spending will not increase, as the city must adjust its appropriations limit downward in proportion to the agency's upward adjustment under article XIII B, section 3, subdivision (a).

Let the writ of mandate issue as prayed.

Bird, C. J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**LUCAS, J.,** Concurring and Dissenting.—I concur with part I of the majority opinion. I do so reluctantly under compulsion of our holding in *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941]. That case, in my view, was wrongly decided; I agree with Justice Richardson's dissent. (See *Richmond* at p. 209.)

I dissent from part II of the majority opinion and from the judgment. When one governmental entity shifts to another the financial responsibility for providing services, the California Constitution permits an apportionment of the transferor's appropriations limit. This apportionment attaches "for the year in which such transfer becomes effective." (Cal. Const., art. XIII B, § 3, subd. (a).) The obvious triggering event for shifting the appropriations limit is the transfer of financial responsibility. It is just as obvious that where there has been no shift in financial responsibility, no apportionment of appropriations limit is allowed.

The majority finds that these strictures are satisfied because the financial responsibility for ending urban blight is constantly transferred to the agency. (*Ante,* p. 109.) I cannot agree. As the majority notes, the financial responsibility for eradicating blight was first transferred from the City of Huntington Park to the agency long ago. (*Ante,* p. 109.) Neither Senate Bill No. 152 (Stats. 1981, ch. 951) nor the city's ordinance shifts any new financial responsibility to the agency.

All that Senate Bill No. 152 and the city's ordinance have effected is an alternative means of financing services for which the agency *already* has financial responsibility. In my opinion, that is insufficient under the plain language of our Constitution to allow the city to shift part of its appropriations limit to the agency.

Accordingly, I would find that Senate Bill No. 152 and the ordinance improperly allow the agency to exceed its "total annual appropriations subject to limitation" under article XIII B, section 1, of the California Constitution and are thus unconstitutional.

I would deny the writ.