[L.A. No. 32106. Jan. 2, 1987.]

COUNTY OF LOS ANGELES et al., Plaintiffs and Appellants, v. THE STATE OF CALIFORNIA et al., Defendants and Respondents.

CITY OF SONOMA et al., Plaintiffs and Appellants, v. THE STATE OF CALIFORNIA et al., Defendants and Respondents.

48

COUNSEL

De Witt W. Clinton, County Counsel, Paula A. Snyder, Senior Deputy County Counsel, Edward G. Pozorski, Deputy County Counsel, John W. Witt, City Attorney, Kenneth K. Y. So, Deputy City Attorney, William D. Ross, Diana P. Scott, Ross & Scott and Rogers & Wells for Plaintiffs and Appellants.

James K. Hahn, City Attorney (Los Angeles), Thomas C. Bonaventura and Richard Dawson, Assistant City Attorneys, and Patricia V. Tubert, Deputy City Attorney, as Amici Curiae on behalf of Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, Henry G. Ullerich and Martin H. Milas, Deputy Attorneys General, for Defendants and Respondents.

Laurence Gold, Fred H. Altshuler, Marsha S. Berzon, Gay C. Danforth, Altshuler & Berzon, Charles P. Scully II, Donald C. Carroll, Peter Weiner, Heller, Ehrman, White & McAuliffe, Donald C. Green, Terrence S. Terauchi, Manatt, Phelps, Rothenberg & Tunney and Clare Bronowski as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**GRODIN, J.**—We are asked in this proceeding to determine whether legislation enacted in 1980 and 1982 increasing certain workers' compensation benefit payments is subject to the command of article XIII B of the California Constitution that local government costs mandated by the state must be funded by the state. The County of Los Angeles and the City of Sonoma sought review by this court of a decision of the Court of Appeal which held that state-mandated increases in workers' compensation benefits that do not exceed the rise in the cost of living are not costs which must be borne by the state under article XIII B, an initiative constitutional provision, and legislative implementing statutes.

Although we agree that the State Board of Control properly denied plaintiffs' claims, our conclusion rests on grounds other than those relied upon by the Court of Appeal, and requires that its judgment be reversed. ██ We conclude that when the voters adopted article XIII B, section 6, their intent was not to require the state to provide subvention whenever a newly enacted statute resulted incidentally in some cost to local agencies. Rather, the drafters and the electorate had in mind subvention for the expense or

increased cost of programs administered locally and for expenses occasioned by laws that impose unique requirements on local governments and do not apply generally to all state residents or entities. In using the word "programs" they had in mind the commonly understood meaning of the term, programs which carry out the governmental function of providing services to the public. Reimbursement for the cost or increased cost of providing workers' compensation benefits to employees of local agencies is not, therefore, required by section 6.

We recognize also the potential conflict between article XIII B and the grant of plenary power over workers' compensation bestowed upon the Legislature by section 4 of article XIV, but in accord with established rules of construction our construction of article XIII B, section 6, harmonizes these constitutional provisions.

I

On November 6, 1979, the voters approved an initiative measure which added article XIII B to the California Constitution. That article imposed spending limits on the state and local governments and provided in section 6 (hereafter section 6): "Whenever the Legislature or any state agency mandates a new program or higher level of service on any local government, the state shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service, except that the Legislature may, but need not, provide such subvention of funds for the following mandates: [¶] (a) Legislative mandates requested by the local agency affected; [¶] (b) Legislation defining a new crime or changing an existing definition of a crime; or [¶] (c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975." No definition of the phrase "higher level of service" was included in article XIII B, and the ballot materials did not explain its meaning.[1]

The genesis of this action was the enactment in 1980 and 1982, after article XIII B had been adopted, of laws increasing the amounts which

---

[1] The analysis by the Legislative Analyst advised that the state would be required to "reimburse local governments for the cost of complying with 'state mandates.' 'State mandates' are requirements imposed on local governments by legislation or executive orders." Elsewhere the analysis repeats: "[T]he initiative would establish a requirement that the state provide funds to reimburse local agencies for the cost of complying with state mandates. . . .

The one ballot argument which made reference to section 6, referred only to the "new program" provision, stating, "Additionally, this measure [¶] (1) will not allow the state government to force programs on local governments without the state paying for them."

employers, including local governnments, must pay in workers' compensation benefits to injured employees and families of deceased employees.

The first of these statutes, Assembly, Bill No. 2750 (Stats. 1980, ch. 1042, p. 3328), amended several sections of the Labor Code related to workers' compensation. The amendments of Labor Code sections 4453, 4453.1 and 4460 increased the maximum weekly wage upon which temporary and permanent disability indemnity is computed from $231 per week to $262.50 per week. The amendment of section 4702 of the Labor Code increased certain death benefits from $55,000 to $75,000. No appropriation for increased state-mandated costs was made in this legislation.[2]

Test claims seeking reimbursement for the increased expenditure mandated by these changes were filed with the State Board of Control in 1981 by the County of San Bernardino and the City of Los Angeles. The board rejected the claims, after hearing, stating that the increased maximum workers' compensation benefit levels did not change the terms or conditions under which benefits were to be awarded, and therefore did not, by increasing the dollar amount of the benefits, create an increased level of service. The first of these consolidated actions was then filed by the County of Los Angeles, the County of San Bernardino, and the City of San Diego, seeking a writ of mandate to compel the board to approve the reimbursement claims for costs incurred in providing an increased level of service mandated by the state pursuant to Revenue and Taxation Code section 2207.[3] They also sought a declaration that because the State of California and the board were obliged by article XIII B to reimburse them, they were not obligated to pay the increased benefits until the state provided reimbursement.

The superior court denied relief in that action. The court recognized that although increased benefits reflecting cost of living raises were not expressly

---

[2] The bill was approved by the Governor and filed with the Secretary of State on September 22, 1980. Prior to this, the Assembly gave unanimous consent to a request by the bill's author that his letter to the Speaker stating the intent of the Legislation be printed in the Assembly Journal. The letter stated: (1) that the Assembly Ways and Means Committee had recommended approval without appropriation on grounds that the increases were a result of changes in the cost of living that were not reimbursable under either Revenue and Taxation Code section 2231, or article XIII B; (2) the Senate Finance Committee had rejected a motion to add an appropriation and had approved a motion to concur in amendments of the Conference Committee deleting any appropriation.

Legislative history confirms only that the final version of Assembly Bill No. 2750, as amended in the Assembly on April 16, 1986, contained no appropriation. As introduced on March 4, 1980, with a higher minimum salary of $510 on which to base benefits, an unspecified appropriation was included.

[3] The superior court consolidated another action by the County of Butte, Novato Fire Protection District, and the Galt Unified School District with that action. Neither those plaintiffs nor the County of San Bernardino are parties to the appeal.

excepted from the requirement of state reimbursement in section 6 the intent of article XIII B to limit governmental expenditures to the prior year's level allowed local governments to make adjustment for changes in the cost of living, by increasing their own appropriations. Because the Assembly Bill No. 2750 changes did not exceed cost of living changes, they did not, in the view of the trial court, create an "increased level of service" in the existing workers' compensation program.

The second piece of legislation (Assem. Bill No. 684), enacted in 1982 (Stats. 1982, ch. 922. p. 3363), again changed the benefit levels for workers' compensation by increasing the maximum weekly wage upon which benefits were to be computed, and made other changes among which were: The bill increased minimum weekly earnings for temporary and permanent total disability from $73.50 to $168, and the maximum from $262.50 to $336. For permanent partial disability the weekly wage was raised from a minimum of $45 to $105, and from a maximum of $105 to $210, in each case for injuries occurring on or after January 1, 1984. (Lab. Code, § 4453.) A $10,000 limit on additional compensation for injuries resulting from serious and willful employer misconduct was removed (Lab. Code, § 4553), and the maximum death benefit was raised from $75,000 to $85,000 for deaths in 1983, and to $95,000 for deaths on or after January 1, 1984. (Lab. Code, § 4702.)

Again the statute included no appropriation and this time the statute expressly acknowledged that the omission was made "[n]otwithstanding section 6 of Article XIIIB of the California Constitution and section 2231 . . . of the Revenue and Taxation Code." (Stats. 1982, ch. 922, § 17, p. 3372.)[4]

Once again test claims were presented to the State Board of Control, this time by the City of Sonoma, the County of Los Angeles, and the City of San Diego. Again the claims were denied on grounds that the statute made no change in the terms and conditions under which workers' compensation benefits were to be awarded, and the increased costs incurred as a result of higher benefit levels did not create an increased level of service as defined in Revenue and Taxation Code section 2207, subdivision (a).

The three claimants then filed the second action asking that the board be compelled by writ of mandate to approve the claims and the state to pay them, and that chapter 922 be declared unconstitutional because it was not adopted in conformity with requirements of the Revenue and Taxation Code or

---

[4]The same section "recognized," however, that a local agency "may pursue any remedies to obtain reimbursement available to it" under the statutes governing reimbursement for state-mandated costs in chapter 3 of the Revenue and Taxation Code, commencing with section 2201.

section 6. The trial court granted partial relief and ordered the board to set aside its ruling. The court held that the board's decision was not supported by substantial evidence and legally adequate findings on the presence of a state-mandated cost. The basis for this ruling was the failure of the board to make adequate findings on the possible impact of changes in the burden of proof in some workers' compensation proceedings (Lab. Code, § 3202.5); a limitation on an injured worker's right to sue his employer under the "dual capacity" exception to the exclusive remedy doctrine (Lab. Code, §§ 3601-3602); and changes in death and disability benefits and in liability in serious and wilful misconduct cases. (Lab. Code, § 4551.)

The court also held: "[T]he changes made by chapter 922, Statutes of 1982 may be excluded from state-mandated costs if that change effects a cost of living increase which does not impose a higher or increased level of service on an existing program." The City of Sonoma, the County of Los Angeles, and the City of San Diego appeal from this latter portion of the judgment only.

## II

The Court of Appeal consolidated the appeals. The court identified the dispositive issue as whether legislatively mandated increases in workers' compensation benefits constitute a "higher level of service" within the meaning of section 6, or are an "increased level of service"[5] described in subdivision (a) of Revenue and Taxation Code section 2207. The parties did not question the proposition that higher benefit payments might constitute a higher level of "service." The dispute centered on whether higher benefit payments which do not exceed increases in the cost of living constitute a higher level of service. Appellants maintained that the reimbursement requirement of section 6 is absolute and permits no implied or judicially created exception for increased costs that do not exceed the inflation rate. The Court of Appeal addressed the problem as one of defining "increased level of service."

The court rejected appellants' argument that a definition of "increased level of service" that once had been included in section 2231, subdivision (e) of the Revenue and Taxation Code should be applied. That definition brought any law that imposed "additional costs" within the scope of "increased level of service." The court concluded that the repeal of section 2231 in 1975 (Stats. 1975, ch. 486, § 7, pp. 999-1000) and the failure of the Legislature by statute or the electorate in article XIII B to readopt the

---

[5]The court concluded that there was no legal or semantic difference in the meaning of the terms and considered the intent or purpose of the two provisions to be identical.

definition must be treated as reflecting an intent to change the law. (*Eu* v. *Chacon* (1976) 16 Cal.3d 465, 470 [128 Cal.Rptr. 1, 546 P.2d 289].)[6] On that basis the court concluded that increased costs were no longer tantamount to an increased level of service.

The court nonetheless assumed that an increase in costs mandated by the Legislature did constitute an increased level of service if the increase exceeds that in the cost of living. The judgment in the second, or "Sonoma" case was affirmed. The judgment in the first, or "Los Angeles" case, however, was reversed and the matter "remanded" to the board for more adequate findings, with directions.[7]

## III

The Court of Appeal did not articulate the basis for its conclusion that costs in excess of the increased cost of living do constitute a reimbursable increased level of service within the meaning of section 6. Our task in ascertaining the meaning of the phrase is aided somewhat by one explanatory reference to this part of section 6 in the ballot materials.

A statutory requirement of state reimbursement was in effect when section 6 was adopted. That provision used the same "increased level of service" phraseology but it also failed to include a definition of "increased level of service," providing only: "Costs mandated by the state' means any increased costs which a local agency is required to incur as a result of the following: [¶] (a) Any law . . . which mandates a new program or an increased level of service of an existing program." (Rev. & Tax. Code § 2207.) As noted, however, the definition of that term which had been

---

[6] The Court of Appeal also considered the expression of legislative intent reflected in the letter by the author of Assembly Bill No. 2750 (see fn. 2, *ante*). While consideration of that expression of intent may have been proper in construing Assembly Bill No. 2750, we question its relevance to the proper construction of either section 6, adopted by the electorate in the prior year, or of Revenue and Taxation Code section 2207, subdivision (a) enacted in 1975. (Cf. *California Employment Stabilization Co.* v. *Payne* (1947) 31 Cal.2d 210, 213-214 [187 P.2d 702].) There is no assurance that the Assembly understood that its approval of printing a statement of intent as to the later bill was also to be read as a statement of intent regarding the earlier statute, and it was not relevant to the intent of the electorate in adopting section 6.

The Court of Appeal also recognized that the history of Assembly Bill No. 2750 and Statutes 1982, chapter 922, which demonstrated the clear intent of the Legislature to omit any appropriation for reimbursement of local government expenditures to pay the higher benefits precluded reliance on reimbursement provisions included in benefit-increase bills passed in earlier years. (See e.g., Stats. 1973, chs. 1021 and 1023.)

[7] We infer that the intent of the Court of Appeal was to reverse the order denying the petition for writ of mandate and to order the superior court to grant the petition and remand the matter to the board with directions to set aside its order and reconsider the claim after making the additional findings. (See Code Civ. Proc. § 1094.5, subd. (f).)

included in Revenue and Taxation Code section 2164.3 as part of the Property Tax Relief Act of 1972 (Stats. 1972, ch. 1406, § 14.7, p. 2961), had been repealed in 1975 when Revenue and Taxation Code section 2231, which had replaced section 2164.3 in 1973, was repealed and a new section 2231 enacted. (Stats. 1975. ch. 486, §§ 6 & 7, p. 999.)[8] Prior to repeal, Revenue and Taxation Code section 2164.3, and later section 2231, after providing in subdivision (a) for state reimbursement, explained in subdivision (e) that " "Increased level of service' means any requirement mandated by state law or executive regulation . . . which makes necessary expanded or additional costs to a county, city and county, city, or special district." (Stats. 1972, ch. 1406, § 14.7, p. 2963.)

■ Appellants contend that despite its repeal, the definition is still valid, relying on the fact that the Legislature, in enacting section 2207, explained that the provision was "declaratory of existing law." (Stats. 1975, ch. 486, § 18.6, p. 1006.) We concur with the Court of Appeal in rejecting this argument. "[I]t is ordinarily to be presumed that the Legislature by deleting an express provision of a statute intended a substantial change in the law." (*Lake Forest Community Assn.* v. *County of Orange* (1978) 86 Cal.App.3d 394, 402 [150 Cal.Rptr. 286]; see also *Eu* v. *Chacon, supra,* 16 Cal.3d 465, 470.) Here, the revision was not minor: a whole subdivision was deleted. As the Court of Appeal noted, "A change must have been intended; otherwise deletion of the preexisting definition makes no sense."

Acceptance of appellants' argument leads to an unreasonable interpretation of section 2207. If the Legislature had intended to continue to equate "increased level of service" with "additional costs," then the provision would be circular: "costs mandated by the state" are defined as "increased costs" due to an "increased level of service," which, in turn, would be defined as "additional costs." We decline to accept such an interpretation. Under the repealed provision, "additional costs" may have been deemed tantamount to an "increased level of service," but not under the post-1975 statutory scheme. Since that definition has been repealed, an act of which the drafters of section 6 and the electorate are presumed to have been

---

[8] Pursuant to the 1972 and successor 1973 property tax relief statutes the Legislature had included appropriations in measures which, in the opinion of the Legislature, mandated new programs or increased levels of service in existing programs (see, e.g., Stats. 1973, ch. 1021, § 4, p. 2026; ch. 1022, § 2, p. 2027; Stats. 1976, ch. 1017, § 9, p. 4597) and reimbursement claims filed with the State Board of Control pursuant to Revenue and Taxation Code sections 2218-2218.54 had been honored. When the Legislature fails to include such appropriations there is no judicially enforceable remedy for the statutory violation notwithstanding the command of Revenue and Taxation Code section 2231, subdivision (a) that "[t]he state shall reimburse each local agency for all 'costs mandated by the state,' as defined in Section 2207" and the additional command of subdivision (b) that any statute imposing such costs "provide an appropriation therefor." (*County of Orange* v. *Flournoy* (1974) 42 Cal.App.3d 908, 913 [117 Cal.Rptr. 224].)

aware, we may not conclude that an intent existed to incorporate the repealed definition into section 6.

■ In construing the meaning of the constitutional provision, our inquiry is not focussed on what the Legislature intended in adopting the former statutory reimbursement scheme, but rather on what the voters meant when they adopted article XIII B in 1979. To determine this intent, we must look to the language of the provision itself. (*ITT World Communications, Inc.* v. *City and County of San Francisco* (1985) 37 Cal.3d 859, 866 [210 Cal.Rptr. 226, 693 P.2d 811].) In section 6, the electorate commands that the state reimburse local agencies for the cost of any "new program or higher level of service." Because workers' compensation is not a new program, the parties have focussed on whether providing higher benefit payments constitutes provision of a higher level of service. As we have observed, however, the former statutory definition of that term has been incorporated into neither section 6 nor the current statutory reimbursement scheme.

■ Looking at the language of section 6 then, it seems clear that by itself the term "higher level of service" is meaningless. It must be read in conjunction with the predecessor phrase "new program" to give it meaning. Thus read, it is apparent that the subvention requirement for increased or higher level of service is directed to state mandated increases in the services provided by local agencies in existing "programs." But the term "program" itself is not defined in article XIII B. What programs then did the electorate have in mind when section 6 was adopted? We conclude that the drafters and the electorate had in mind the commonly understood meanings of the term—programs that carry out the governmental function of providing services to the public, or laws which, to implement a state policy, impose unique requirements on local governments and do not apply generally to all residents and entities in the state.

The concern which prompted the inclusion of section 6 in article XIII B was the perceived attempt by the state to enact legislation or adopt administrative orders creating programs to be administered by local agencies, thereby transferring to those agencies the fiscal responsibility for providing services which the state believed should be extended to the public. In their ballot arguments, the proponents of article XIII B explained section 6 to the voters: "Additionally, this measure: (1) Will not allow the state government to *force programs* on local governments without the state paying for them." (Ballot Pamp., Proposed Amend. to Cal. Const. with arguments to voters, Spec. Statewide Elec. (Nov. 6, 1979) p. 18. Italics added.) In this context the phrase "to force programs on local governments" confirms that the intent underlying section 6 was to require reimbursement to local agencies for the costs involved in carrying out functions peculiar to government, not

for expenses incurred by local agencies as an incidental impact of laws that apply generally to all state residents and entities. Laws of general application are not passed by the Legislature to "force" programs on localities.

The language of section 6 is far too vague to support an inference that it was intended that each time the Legislature passes a law of general application it must discern the likely effect on local governments and provide an appropriation to pay for any incidental increase in local costs. We believe that if the electorate had intended such a far-reaching construction of section 6, the language would have explicitly indicated that the word "program" was being used in such a unique fashion. (Cf. *Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449]; *Big Sur Properties* v. *Mott* (1976) 63 Cal.App.3d 99, 105 [132 Cal.Rptr. 835].) Nothing in the history of article XIII B that we have discovered, or that has been called to our attention by the parties, suggests that the electorate had in mind either this construction or the additional indirect, but substantial impact it would have on the legislative process.

Were section 6 construed to require state subvention for the incidental cost to local governments of general laws, the result would be far-reaching indeed. Although such laws may be passed by simple majority vote of each house of the Legislature (art. IV, § 8, subd. (b)), the revenue measures necessary to make them effective may not. A bill which will impose costs subject to subvention of local agencies must be accompanied by a revenue measure providing the subvention required by article XIII B. (Rev. & Tax. Code, §§ 2255, subd. (c).) Revenue bills must be passed by two-thirds vote of each house of the Legislature. (Art. IV, § 12, subd. (d).) Thus, were we to construe section 6 as applicable to general legislation whenever it might have an incidental effect on local agency costs, such legislation could become effective only if passed by a supermajority vote.[9] Certainly no such intent is reflected in the language or history of article XIII B or section 6.

We conclude therefore that section 6 has no application to, and the state need not provide subvention for, the costs incurred by local agencies in providing to their employees the same increase in workers' compensation

---

[9] Whether a constitutional provision which requires a supermajority vote to enact substantive legislation, as opposed to funding the program, may be validly enacted as a Constitutional amendment rather than through revision of the Constitution is an open question. (See *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 228 [149 Cal.Rptr. 239, 583 P.2d 1281].)

benefits that employees of private individuals or organizations receive.[10] Workers' compensation is not a program administered by local agencies to provide service to the public. Although local agencies must provide benefits to their employees either through insurance or direct payment, they are indistinguishable in this respect from private employers. In no sense can employers, public or private, be considered to be administrators of a program of workers' compensation or to be providing services incidental to administration of the program. Workers' compensation is administered by the state through the Division of Industrial Accidents and the Workers' Compensation Appeals Board. (See Lab. Code, § 3201 et seq.) Therefore, although the state requires that employers provide workers' compensation for nonexempt categories of employees, increases in the cost of providing this employee benefit are not subject to reimbursement as state-mandated programs or higher levels of service within the meaning of section 6.

## IV

■ Our construction of section 6 is further supported by the fact that it comports with controlling principles of construction which "require that in the absence of irreconcilable conflict among their various parts, [constitutional provisions] must be harmonized and construed to give effect to all parts. (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 1 Cal.3d 801, 813-814 [114 Cal.Rptr. 577, 523 P.2d 617]; *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 596 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].)" (*Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658, 676 [194 Cal.Rptr. 781, 669 P.2d 17].)

Our concern over potential conflict arises because article XIV, section 4,[11] gives the Legislature "plenary power, unlimited by any provision of

---

[10] The Court of Appeal reached a different conclusion in *City of Sacramento* v. *State of California* (1984) 156 Cal.App.3d 182 [203 Cal.Rptr. 258], with respect to a newly enacted law requiring that all public employees be covered by unemployment insurance. Approaching the question as to whether the expense was a "state mandated cost," rather than as whether the provision of an employee benefit was a "program or service" within the meaning of the Constitution, the court concluded that reimbursement was required. To the extent that this decision is inconsistent with our conclusion here, it is disapproved.

[11] Section 4: "The Legislature is hereby *expressly vested with plenary power, unlimited by any provision of this Constitution,* to create, and enforce a complete system of workers' compensation, by appropriate legislation, and in that behalf to create and enforce a liability on the part of any or all persons to compensate any or all of their workers for injury or disability, and their dependents for death incurred or sustained by the said workers in the course of their employment, irrespective of the fault of any party. A complete system of workers' compensation includes adequate provisions for the comfort, health and safety and general welfare of any and all workers and those dependent upon them for support to the extent of relieving from the consequences of any injury or death incurred or sustained by

this Constitution" over workers' compensation. Although seemingly unrelated to workers' compensation, section 6, as we have shown, would have an indirect, but substantial impact on the ability of the Legislature to make future changes in the existing workers' compensation scheme. Any changes in the system which would increase benefit levels, provide new services, or extend current service might also increase local agencies' costs. Therefore, even though workers' compensation is a program which is intended to provide benefits to all injured or deceased employees and their families, because the change might have some incidental impact on local government costs, the change could be made only if it commanded a supermajority vote of two-thirds of the members of each house of the Legislature. The potential conflict between section 6 and the plenary power over workers' compensation granted to the Legislature by article XIV, section 4 is apparent.

The County of Los Angeles, while recognizing the impact of section 6 on the Legislature's power over workers' compensation, argues that the "plenary power" granted by article XIV, section 4, is power over the substance of workers' compensation legislation, and that this power would be unaffected by article XIII B if the latter is construed to compel reimbursement. The subvention requirement, it is argued, is analogous to other proce-

---

workers in the course of their employment, irrespective of the fault of any party; also full provision for securing safety in places of employment; full provision for such medical, surgical, hospital and other remedial treatment as is requisite to cure and relieve from the effects of such injury; full provision for adequate insurance coverage against liability to pay or furnish compensation; full provision for regulating such insurance coverage in all its aspects, including the establishment and management of a State compensation insurance fund; full provision for otherwise securing the payment of compensation and full provision for vesting power, authority and jurisdiction in an administrative body with all the requisite governmental functions to determine any dispute or matter arising under such legislation, to the end that the administration of such legislation shall accomplish substantial justice in all cases expeditiously, inexpensively, and without encumbrance of any character; all of which matters are expressly declared to be the social public policy of this State, binding upon all departments of the State government.

"The Legislature is vested with plenary powers, to provide for the settlement of any disputes arising under such legislation by arbitration, or by an industrial accident commission, by the courts, or by either, any, or all of these agencies, either separately or in combination, and may fix and control the method and manner of trial of any such dispute, the rules of evidence and the manner of review of decisions rendered by the tribunal or tribunals designated by it; provided, that all decisions of any such tribunal shall be subject to review by the appellate courts of this State. The Legislature may combine in one statute all the provisions for a complete system of workers' compensation, as herein defined.

"The Legislature shall have power to provide for the payment of an award to the state in the case of the death, arising out of and in the course of the employment, of an employee without dependents, and such awards may be used for the payment of extra compensation for subsequent injuries beyond the liability of a single employer for awards to employees of the employer.

"Nothing contained herein shall be taken or construed to impair or render ineffectual in any measure the creation and existence of the industrial accident commission of this State or the State compensation insurance fund, the creation and existence of which, with all the functions vested in them, are hereby ratified and confirmed." (Italics added.)

dural limitations on the Legislature, such as the "single subject rule" (art. IV, § 9), as to which article XIV, section 4, has no application. We do not agree. A constitutional requirement that legislation either exclude employees of local governmental agencies or be adopted by a supermajority vote would do more than simply establish a format or procedure by which legislation is to be enacted. It would place workers' compensation legislation in a special classification of substantive legislation and thereby curtail the power of a majority to enact substantive changes by any procedural means. If section 6 were applicable, therefore, article XIII B would restrict the power of the Legislature over workers' compensation.

The City of Sonoma concedes that so construed article XIII B *would* restrict the plenary power of the Legislature, and reasons that the provision therefore either effected a pro tanto repeal of article XIV, section 4, or must be accepted as a limitation on the power of the Legislature. We need not accept that conclusion, however, because our construction of section 6 permits the constitutional provisions to be reconciled.

Construing a recently enacted constitutional provision such as section 6 to avoid conflict with, and thus pro tanto repeal of, an earlier provision is also consistent with and reflects the principle applied by this court in *Hustedt* v. *Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329 [178 Cal.Rptr. 801, 636 P.2d 1139]. There, by coincidence, article XIV, section 4, was the later provision. A statute, enacted pursuant to the plenary power of the Legislature over workers' compensation, gave the Workers' Compensation Appeals Board authority to discipline attorneys who appeared before it. If construed to include a transfer of the authority to discipline attorneys from the Supreme Court to the Legislature, or to delegate that power to the board, article XIV, section 4, would have conflicted with the constitutional power of this court over attorney discipline and might have violated the separation of powers doctrine. (Art. III, § 3.) The court was thus called upon to determine whether the adoption of article XIV, section 4, granting the Legislature plenary power over workers' compensation effected a pro tanto repeal of the preexisting, exclusive jurisdiction of the Supreme Court over attorneys.

We concluded that there had been no pro tanto repeal because article XIV, section 4, did not give the Legislature the authority to enact the statute. Article XIV, section 4, did not expressly give the Legislature power over attorney discipline, and that power was not integral to or necessary to the establishment of a complete system of workers' compensation. In those circumstances the presumption against implied repeal controlled. "It is well established that the adoption of article XIV, section 4 'effected a repeal *pro tanto*' of any state constitutional provisions which conflicted with that

amendment. (*Subsequent Etc. Fund.* v. *Ind. Acc. Com.* (1952) 39 Cal.2d 83, 88 [244 P.2d 889]; *Western Indemnity Co.* v. *Pillsbury* (1915) 170 Cal. 686, 695, [151 P. 398].) A *pro tanto* repeal of conflicting state constitutional provisions removes 'insofar as necessary' any restrictions which would prohibit the realization of the objectives of the new article. (*Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691-692 [97 Cal.Rptr. 1, 488 P.2d 161]; cf. *City and County of San Francisco* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 103, 115-117 [148 Cal.Rptr. 626, 583 P.2d 151].) Thus the question becomes whether the board must have the power to discipline attorneys if the objectives of article XIV, section 4 are to be effectuated. In other words, does the achievement of those objectives compel the modification of a power—the disciplining of attorneys—that otherwise rests exclusively with this court?" (*Hustedt* v. *Workers' Comp. Appeals Bd., supra,* 30 Cal.3d 329, 343.) We concluded that the ability to discipline attorneys appearing before it was not necessary to the expeditious resolution of workers' claims or the efficient administration of the agency. Thus, the absence of disciplinary power over attorneys would not preclude the board from achieving the objectives of article XIV, section 4, and no pro tanto repeal need be found.

A similar analysis leads to the conclusion here that no pro tanto repeal of article XIV, section 4, was intended or made necessary here by the adoption of section 6. The goals of article XIII B, of which section 6 is a part, were to protect residents from excessive taxation and government spending. (*Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100, 109-110 [211 Cal.Rptr. 133, 695 P.2d 220].) Section 6 had the additional purpose of precluding a shift of financial responsibility for carrying out governmental functions from the state to local agencies which had had their taxing powers restricted by the enactment of article XIII A in the preceding year and were ill equipped to take responsibility for any new programs. Neither of these goals is frustrated by requiring local agencies to provide the same protections to their employees as do private employers. Bearing the costs of salaries, unemployment insurance, and workers' compensation coverage—costs which all employers must bear—neither threatens excessive taxation or governmental spending, nor shifts from the state to a local agency the expense of providing governmental services.

Therefore, since the objectives of article XIII B and section 6 can be achieved in the absence of state subvention for the expense of increases in workers' compensation benefit levels for local agency employees, section 6 did not effect a pro tanto repeal of the Legislature's otherwise plenary power over workers' compensation, a power that does not contemplate that the Legislature rather than the employer must fund the cost or increases in

benefits paid to employees of local agencies, or that a statute affecting those benefits must garner a supermajority vote.

Because we conclude that section 6 has no application to legislation that is applicable to employees generally, whether public or private, and affects local agencies only incidentally as employers, we need not reach the question that was the focus of the decision of the Court of Appeal—whether the state must reimburse localities for state-mandated cost increases which merely reflect adjustments for cost-of-living in existing programs.

## V

It follows from our conclusions above, that in each of these cases the plaintiffs' reimbursement claims were properly denied by the State Board of Control. Their petitions for writs of mandate seeking to compel the board to approve the claims lacked merit and should have been denied by the superior court without the necessity of further proceedings before the board.

In B001713, the Los Angeles case, the Court of Appeal reversed the judgment of the superior court denying the petition. In the B003561, the Sonoma case, the superior court granted partial relief, ordering further proceedings before the board, and the Court of Appeal affirmed that judgment.

The judgment of the Court of Appeal is reversed. Each side shall bear its own costs.

Bird, C. J., Broussard, J., Reynoso, J., Lucas, J., and Panelli, J., concurred.

**MOSK, J.**—I concur in the result reached by the majority, but I prefer the rationale of the Court of Appeal, i.e., that neither article XIII B, section 6, of the Constitution nor Revenue and Taxation Code sections 2207 and 2231 require state subvention for increased workers' compensation benefits provided by chapter 1042, Statutes of 1980, and chapter 922, Statutes of 1982, but only if the increases do not exceed applicable cost-of-living adjustments because such payments do not result in an increased level of service.

Under the majority theory, the state can order unlimited financial burdens on local units of government without providing the funds to meet those burdens. This may have serious implications in the future, and does violence to the requirement of section 2231, subdivision (a), that the state reimburse local government for "all costs mandated by the state."

In this instance it is clear from legislative history that the Legislature did not intend to mandate additional burdens, but merely to provide a cost-of-

living adjustment. I agree with the Court of Appeal that this was permissible.

Appellants' petition for a rehearing was denied February 26, 1987.