[No. B010487. Second Dist., Div. Seven. June 10, 1987.]

ALTADENA LIBRARY DISTRICT et al., Plaintiffs and Appellants, v. MARK C. BLOODGOOD, as County Auditor, etc., Defendant and Respondent.

**COUNSEL**

O'Donnell & Gordon, Pierce O'Donnell, George R. Hedges and Mary E. Newcombe for Plaintiffs and Appellants.

Ronald A. Zumbrun, John H. Findley and Sharon L. Browne as Amici Curiae for Plaintiffs and Appellants.

DeWitt W. Clinton, County Counsel, and Philip H. Hickok, Deputy County Counsel, for Defendant and Respondent.

**OPINION**

**JOHNSON, J.**—In this case the supporters of a community library ask whether Proposition 13's requirement that at least two-thirds of the voters approve new tax levies is constitutional as applied to a library district initiative supported by 61.8 percent of the voters. Under the holding and rationale of prior United States and California Supreme Court decisions, we conclude it is and affirm.

STATEMENT OF FACTS AND PROCEEDINGS BELOW

The Altadena Library District is one of only 12 special library districts in the state. Its elected board of trustees is empowered to administer the district and to levy taxes. (Ed. Code, § 19600 et seq.)

The Altadena Library District has been providing a full range of library services to the residents of the City of Altadena since 1926. At present it operates a main library building which was opened in 1967 and houses over 100,000 books. Until Proposition 13 forced budget cutbacks it also ran a branch library in Altadena's predominately minority neighborhood containing 10,000 volumes. Among other things the library also holds daily classes in library use for elementary school children, provides a stage for community theatrical productions, classical and contemporary music concerts, and a community meeting room.

Tax revenues account for approximately 90 percent of the district's total revenues with the remainder coming from fines, copier rentals and government grants. On June 6, 1978, California voters passed Proposition 13 with a 64.8 percent vote. This proposition substantially reduced the property tax revenues available to governments in the State of California. It compelled the Altadena Library District to close down the branch library, lay off 37 percent of the library staff, reduce the remaining staff to 80 percent time, and reduce the hours of operation by 46 percent. The Altadena Library has had to reduce its purchases of books by 46.65 percent, its purchases of records by 46.6 percent, cassettes by 31.8 percent and to eliminate entirely future purchases of films and art.

After watching this deterioration for several years, finally a group of Altadena citizens sought to restore the tax revenue loss which had forced these drastic cutbacks. On March 8, 1983, an initiative was put to a special election. The initiative provided: " 'Shall the Altadena Library District be authorized to levy an annual tax in the amount of $29.00 on each parcel of land within the boundaries of the district for a period of not more than four years?' " If enacted, this initiative would have allowed the district to restore the former level of purchases and program operations and to consider reopening the branch library in Altadena's minority community; 61.8 percent of Altadenians voted in favor of the initiative.

The controller for the County of Los Angeles refused to levy this new special tax. He found section 4 of Proposition 13 precluded the imposition of any such tax in the absence of a two-thirds supermajority vote in favor of the initiative. At 61.8 percent, the initiative fell 4.9 percent short of the necessary vote.

On March 22, 1984, the Altadena Library District, members of its board of trustees and several library users filed a petition seeking an alternative writ of mandate in the California Supreme Court. The Supreme Court transferred the petition to Division Three of this court which summarily denied the requested relief. On July 12, 1984, the Supreme Court summarily denied review of Division Three's denial of the petition. The petitioners then filed a motion for writ of mandate in the Superior Court of Los Angeles County. The court refused to issue the writ and petitioners appeal from that decision.

## DISCUSSION

The petitioners (library supporters) claim exemption from Proposition 13's supermajority requirement for two alternative reasons:

■ (I) They contend the Altadena Library District is not a "special district" within the meaning of section 4 of Proposition 13 and thus is not governed by the supermajority requirement imposed on "special districts."

■ (II) Alternatively, they contend the supermajority requirement must be subjected to close scrutiny because it interferes with their fundamental rights to education guaranteed by the California Constitution.

We are compelled to reject both these contentions.

## I. THE ALTADENA LIBRARY DISTRICT IS A "SPECIAL DISTRICT" SEEKING TO IMPOSE A "SPECIAL TAX ON PROPERTY" WITHIN THE MEANING OF ARTICLE XIII A, SECTION 4 OF THE CALIFORNIA CONSTITUTION.

Section 4 of Proposition 13 (now art. XIII A, § 4, Cal. Const.) reads as follows: "Cities, Counties and *special districts,* by a *two-thirds vote* of the qualified electors of such district, *may impose special taxes* on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district." (Italics added.)

Two recent California Supreme Court cases held certain government entities were not "special districts" and thus did not fall under the supermajority requirements of section 4. (*Los Angeles County Transportation Com. v. Richmond* (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941]; *Huntington Park Redevelopment Agency* v. *Martin* (1985) 38 Cal.3d 100 [211 Cal.Rptr. 133, 695 P.2d 220].) The library supporters seek shelter for the Altadena Library District under the protective umbrella of these cases.

Unfortunately for their position, however, the rationale of these California Supreme Court cases does not lend the district such shelter.

One of the cited cases involved a regional transportation commission and the other an urban renewal agency. In both instances, the Supreme Court based its decision these governmental bodies were outside the definition of "special districts" on a finding they did not have the power to impose *property* taxes. (31 Cal.3d at p. 202; 38 Cal.3d at p. 107.) ■ In contrast, the Altadena Library District not only claims the power to impose taxes on property but indeed the levy this initiative purported to create was itself a "special tax on property"—that is, a $29 per year tax on each piece of real property within the city limits of Altadena. Accordingly, the Altadena Library District fits the definition of a "special district" and the supermajority requirement of article XIII A, section 4 applies as it would to any other "special district."

II. THE CALIFORNIA SUPREME COURT HAS ALREADY HELD THE SUPERMAJORITY REQUIREMENT OF PROPOSITION 13 CAN BE CONSTITUTIONALLY IMPOSED ON GOVERNMENTAL ENTITIES SUPPLYING EDUCATIONAL SERVICES SUCH AS IMPOSED ON A LIBRARY DISTRICT.

■ The library supporters offer an intriguing constitutional argument which on its face is far more promising than their statutory interpretation claim. They first contend libraries like schools are involved in delivering education to the population of California. They next contend that the California Supreme Court has expressly held that education is a "fundamental interest." (*Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929].) Under equal protection analysis, any law which interferes with a "fundamental interest" must be subjected to close scrutiny and overturned unless the measure serves some "compelling state interest" and is carefully and narrowly defined to minimize its interference with the "fundamental interest." (See, e.g., *Shapiro* v. *Thompson* (1969) 394 U.S. 618 [22 L.Ed.2d 600, 89 S.Ct. 1322]; *Boddie* v. *Connecticut* (1971) 401 U.S. 371 [28 L.Ed.2d 113, 91 S.Ct. 780]; *Serrano* v. *Priest, supra*; Tribe, American Constitutional Law (1978) pp. 1000-1011, and cases cited therein.)

This promising constitutional argument arrives in this court in a rather leaky vessel, however. This is because of what the California Supreme Court did in *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281].

In *Amador,* a school district, among others, challenged the constitutionality of Proposition 13 on several counts including the supermajority re-

quirement in section 4. The Supreme Court dispatched this part of the challenge in a single paragraph.

"Petitioners have also questioned whether the requirement of a two-thirds vote to approve 'special' local taxes ... denies to voters the equal protection of the laws .... Petitioners rely upon our decision in *Westbrook* v. *Mihaly, supra,* 2 Cal.3d 765, wherein we held that a two-thirds requirement for approval of county general obligation bonds violated federal equal protection principles. However, our *Westbrook* opinion was vacated by the United States Supreme Court (*Mihaly* v. *Westbrook* (1971) 403 U.S. 915 ...) and the cause was remanded for our reconsideration in the light of *Gordon* v. *Lance* (1971) 403 U.S. 1 ... , a case which upheld a 60 percent vote requirement primarily because no 'discrete and insular minority' was singled out for special treatment by application of the voting requirement. Thus, *Westbrook* no longer represents the controlling law on the subject.... Because persons who vote in favor of tax measures may not be deemed to represent a definite, identifiable class, equal protection principles do not forbid 'debasing' their vote by requiring a two-thirds approval of such measures." (*Id.,* at p. 237.)

Although the *Amador* court did not expressly consider the implications of this state's fundamental interest in education, the lead petitioner in the case in fact was a school district. If a public library district serves the fundamental interest in education, as appellants contend, it is even clearer the school district in *Amador* did. Yet the Supreme Court ruled a supermajority requirement would not deny equal protection to the unsuccessful majority.

More significantly, the grounds of the *Amador* decision mean we do not reach the question whether the supermajority requirement interferes with a fundamental interest. In equal protection analysis, the threshold question is whether the legislation under attack somehow discriminates against an identifiable class of persons. (*Gordon* v. *Lance* (1971) 403 U.S. 1, 4-5 [29 L.Ed.2d 273, 275-276, 91 S.Ct. 1889].) Only then do the courts ask the further question of whether this identifiable group is a suspect class or is being denied some fundamental interest, thus requiring the discrimination to be subjected to close scrutiny. In *Amador* the California Supreme Court following previous California Supreme Court and United States Supreme Court decisions answered the threshold question in the negative.

The United States Supreme Court, in *Gordon* v. *Lance, supra,* 403 U.S. 1, distinguished a supermajority requirement from laws which denied the vote entirely to people without property (*Cipriano* v. *Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897]) or gave less weight to the votes of people in

one county than those in another. (*Gray* v. *Sanders* (1963) 372 U.S. 368 [9 L.Ed.2d 821, 83 S.Ct. 801].) "The defect this Court found in those cases lay in the denial or dilution of voting power because of group characteristics—geographic location and property ownership—that *bore no* valid *relation to the interest of those groups in the subject matter of the election*; moreover, the dilution or denial was imposed *irrespective of how* members of those *groups actually voted*." (403 U.S. at p. 4 [29 L.Ed.2d at pp. 275-276], italics added, fn. omitted.)

Thus, the nation's highest court found that people without property or people who live in a disfavored county comprise "identifiable" classes. The dilution of voting strength in the instant case, in contrast, depends on which way a person voted in the election. True, if the voter cast a ballot *for* a tax increase as to a certain proposition his vote *would* be diluted by the super-majority requirement. Yet if he voted *against* a tax increase in another election even on that same ballot his vote would *not* be diluted. Indeed his voting power would be enhanced. Thus, the *very same person* could see his voting strength both diluted and enhanced *at the very same election* by a supermajority requirement. Accordingly, in the view of the Supreme Court the group whose votes are diluted as to one proposition on the ballot does not represent an "identifiable" group of people.

In the same opinion, the Supreme Court distinguished general superma-jority requirements from similar "vote dilution" measures directed at an "identifiable" group. "We are not ... presented with a case like *Hunter* v. *Erickson* [(1969) 393 U.S. 385 (21 L.Ed.2d 616, 89 S.Ct. 557)], in which fair housing legislation alone was subject to an automatic referendum require-ment. [¶]The class singled out in *Hunter* was clear—'those who would benefit from laws barring racial, religious, or ancestral discriminations,' [citation omitted]. In contrast we can discern *no independently identifiable group* or category that favors bonded indebtedness over other forms of financing. Consequently no sector of the population may be said to be 'fenced out' from the franchise because of the way they will vote." (403 U.S. at p. 5 [29 L.Ed.2d at p. 276], italics added.)

Likewise, in the instant case, if Proposition 13 had singled out education and imposed a supermajority requirement solely on tax increases to be used for that purpose the library supporters might well have had a valid equal protection claim under *Hunter* v. *Erickson*. Under this assumption, the proposition would have *drawn the legislative classification* on the basis of membership in an "independently identifiable" class—"those who would benefit from" increased expenditures on education as opposed to those who would benefit from increased expenditures on other governmental services. But Proposition 13, like the supermajority requirement in *Gordon* v. *Lance*,

"applies equally to all [revenue increases] for any purpose, whether for schools, sewers, or highways." (403 U.S. at p. 5)

We may sympathize with the near two-thirds of Altadena voters at the March 8, 1983, election who voted to tax themselves a bit higher in order to restore badly needed services to their community library. But, unfortunately for their plight, Proposition 13 amended the California Constitution to deny even near two-thirds majorities the power to impose increased taxes on property. It is not our role to judge the wisdom of this limitation on majority rule, only to pass on its constitutionality. The United States Supreme Court in *Gordon* v. *Lance* held the majority of voters who are denied the benefits they voted themselves because of a supermajority requirement do not constitute an identifiable class for equal protection purposes.[1] Thus, the California Supreme Court did not have occasion to reach the suspect class-fundamental interest issue in *Amador*. Nor do we in this case.

### DISPOSITION

The judgment denying a writ of mandate is affirmed.

Lillie, P. J., and Thompson, J., concurred.

---

[1] We do not reach the question whether a law imposing a requirement of a unanimous vote or an extremely high supermajority would be constitutional. The United States Supreme Court expressly reserved this question in *Gordon* v. *Lance* without mentioning which constitutional guarantee a *super* supermajority requirement like this might conceivably violate. (*Gordon* v. *Lance, supra,* 403 U.S. 1, 8, fn. 6.) Nor do we purport to have considered and decided every other constitutional challenge which might be lodged against the supermajority requirement in art. XIII A, section 4 of the California Constitution. Instead this opinion is confined to the specific constitutional issue the library supporters raised—does the fundamental interest in education render this supermajority requirement unconstitutional as applied to a special tax on property aimed at increasing the funding of an educational institution.