[No. A101716. First Dist., Div. One. Jan. 22, 2004.]

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Respondents.

## COUNSEL

Thelen Reid & Priest, Anthony J. Barron, Aaron L. Danzer, Michael C. Hughes; James E. Holst and Stephen P. Morrell, for Plaintiff and Appellant.

Dennis J. Herrera, Joanne Hoeper, Donald P. Margolis and Ellen Forman for Defendants and Respondents.

## OPINION

**MARCHIANO, P. J.**—The Regents of the University of California (Regents) sued the City and County of San Francisco (City) for refund of allegedly excessive water and sewer charges. The trial court granted the City's motion for summary judgment on the ground that the Regents' action was time-barred by the 120-day limitations period of Government Code section 66022. The Regents contend the trial court erred by ruling the limitations period was triggered by the City's 1996 resolutions increasing the water and sewer rates, and not by the City's 1999 annual budget resolution. We disagree and affirm.

## I. BACKGROUND

This case involves setting and collecting proper charges for public entities as customers of public utilities. In 1986, the California Supreme Court held that, absent legislative authorization, a public utility could not charge a public entity a fee to defray the costs of capital improvements. (*San Marcos Water Dist. v. San Marcos Unified School Dist.* (1986) 42 Cal.3d 154, 161–165 [228 Cal.Rptr. 47, 720 P.2d 935] (*San Marcos I*); see *Utility Cost Management v. East Bay Mun. Utility Dist.* (2000) 79 Cal.App.4th 1242, 1246 [94 Cal.Rptr.2d 777] (*Utility Cost Management*).)

In response to *San Marcos I*, the Legislature enacted what is popularly known as "the San Marcos Legislation" in 1988. (Gov. Code, § 54999 et seq.; *Utility Cost Management v. Indian Wells Valley Water Dist.* (2001) 26 Cal.4th 1185, 1189–1190 [114 Cal.Rptr.2d 459, 36 P.3d 2] (*Indian Wells*); *Utility Cost Management, supra,* 79 Cal.App.4th at pp. 1246–1247.)[1]

In section 54999, subdivision (a), the Legislature found that *San Marcos I* "seriously impaired" the ability of public utilities to "finance essential future facilities." In subdivision (b), the Legislature authorized public utilities to charge capital facilities fees subject to certain limitations. The primary limitations are the requirements that (1) the capital facilities fee must defray actual construction costs of that portion of a facility actually serving a public agency, and (2) the fee may not normally be increased beyond the percentage increase in the "Implicit Price Deflator for State and Local Government Purchases." (§ 54999.3, subds. (a), (b); *Indian Wells, supra,* 26 Cal.4th at pp. 1189–1190; *Utility Cost Management, supra,* 79 Cal.App.4th at p. 1247.)

█ An action seeking a refund of allegedly excessive capital facilities fees is governed by the 120-day statute of limitations of section 66022. (*Indian Wells, supra,* 26 Cal.4th at pp. 1187, 1190–1192, 1199; *Utility Cost Management, supra,* 79 Cal.App.4th at pp. 1247–1253.) Section 66022 imposes a 120-day statute of limitations on "[a]ny judicial action or proceeding to attack, review, set aside, void, or annul an ordinance, resolution, or motion adopting a new fee or service charge, or modifying or amending an existing fee or service charge, adopted by a local agency . . . ."

The purpose of such a short statute of limitations is to enhance the budgetary stability of public utilities, by promptly informing them of any challenges to their ability to charge and collect capital facilities fees. (*Utility Cost Management, supra,* 79 Cal.App.4th at pp. 1248–1249; *San Marcos Water Dist. v. San Marcos Unified School Dist.* (1987) 190 Cal.App.3d 1083, 1085 [235 Cal.Rptr. 827].)

---

[1] Subsequent statutory citations are to the Government Code unless otherwise indicated.

## II. FACTS

The material facts of this case are essentially undisputed. The dispute lies in the characterization and interpretation of those facts.

On July 1, 1996, the City increased its water and sewer rates through two resolutions of the San Francisco Board of Supervisors (Board): the water rates in Resolution No. 566-96, and the sewer rates in Resolution No. 406-96. The City did not increase its rates again prior to the Regents' filing of its lawsuit on March 24, 2000.

*Board Resolution No. 566-96*

The proposed water rate increase began with proceedings before the San Francisco Public Utilities Commission (PUC), which led to proceedings before the Board.

In March 1996 the PUC published notices in San Francisco newspapers of a public hearing on a proposed increase of water rates. The PUC released to the public a "Report on Revenue Requirement and Rates for Fiscal Year 1996–97" (Water Rate Report), dated March 29, 1996.

The Water Rate Report made it clear that the purpose of the proposed rate increase was to recover both operating and capital costs: "The proposed rate adjustments for customers supplied by the San Francisco Water Department are for the purpose of meeting operating expense, including employee wages and fringe benefits, purchasing or leasing of supplies, equipment or materials, meeting financial reserve requirements, *obtaining funds for capital projects necessary to maintain service within the existing service areas* and for other budgetary requirements of the San Francisco Water Department." (Italics added.)

At the public hearing, William Laws, the Rate Administrator for the PUC, gave a Power Point presentation that showed revenues from water rates went, in part, toward capital costs. At the conclusion of the hearing, the PUC passed a resolution adopting the proposed 7.6 percent rate increase. The PUC resolution specifically stated the rate increase was for the purpose, inter alia, of "obtaining funds for capital projects necessary to maintain service within existing service areas . . . ."

In May 1996, after the PUC approved the proposed rate increase, the Board published notice that it would hold a public hearing to consider the increase. The Board made public the Water Rate Report and the PUC

resolution—as well as the proposed Board resolution, which made it clear the proposed rate increase would cover capital costs.

After the hearing, the Board passed the proposed resolution as Resolution No. 566-96, which adopted the 7.6 percent water rate increase "for the purpose of . . . [inter alia] obtaining funds for capital projects . . . ." Resolution No. 566-96 went into effect July 1, 1996.

*Board Resolution No. 406-96*

The City increased its sewer rates in 1996 solely by Board action, without prior PUC proceedings. The Board published notice of a public hearing regarding the proposed sewer rate increases, and the City published a report entitled "Clean Water Enterprise Five Year Revenue Plan 1996/97–2000/01" (Sewer Rate Report). The Sewer Rate Report states that revenues generated by sewer rates go, in part, to capital projects, including repair and replacement of sewers, sewage treatment plants, pumping facilities, and debt service of the sewer system.

After the public hearing the Board passed Resolution No. 406-96, which states that the City "must establish sewer service charges which will produce sufficient revenue to meet the cost of operation and maintenance, replacement of equipment and structures, and debt service of the sewage system . . . ." Resolution No. 406-96 also took effect July 1, 1996.

*Events Subsequent to Both Board Resolutions*

After the City increased its water and sewer rates in 1996, it printed "bill messages" on all customers' bills informing them of the increases. The City also sent a "billing insert" to all customers, informing them of the increases and stating that the increases would go in part for capital projects, including repair and replacement of water mains, sewers, sewage treatment plants and pumping facilities.

As noted, the City did not further increase its water and sewer rates from July 1, 1996, until the time the Regents filed the instant lawsuit. But the PUC did hold annual hearings on the rates, and published rate reports that indicated "San Francisco's water and sewer rates are intended to pay for capital expenditures."

From at least November 1, 1991, to the present, the University of California's own Facilities Manual (1) emphasizes the need for the university's participation in regulatory proceedings regarding utility rates, and (2)

admits that periodic capital fees may not be separately identified on billings, "but may be [i]mbedded in an overall utility rate."

The City moved for summary judgment on the ground that the Regents had to file the action within 120 days of July 1, 1996, and did not do so. The trial court agreed and granted the motion.

## III. DISCUSSION

■ We review the grant of summary judgment de novo. (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 60 [65 Cal.Rptr.2d 366, 939 P.2d 766].)

The Regents claim the 1999 annual budget resolution triggered the 120-day statutory limitations period, and that by using this trigger their action is timely. The Regents rely on facts involving the Board's annual budget process. These facts are essentially undisputed, arising from deposition testimony of City employees Patricia Martel and William Laws.

The PUC operates under an annual budget, which includes expenditures for the water and sewer utilities for the fiscal year of July 1 to June 30. The budget is approved every year by the Board.

Laws testified in his deposition that the water and sewer rates include an unspecified component that would be spent on capital, and another that would be spent on operations and maintenance. In other words, there is no separate, distinct capital facilities fee. Laws explained that each annual budget allocates a certain amount of rate revenues to capital costs, and a certain amount to cost of operations and maintenance. That amount changes from year to year. In Laws's words, "The percentage of costs that are part of the operating component and capital component may change [from] year to year based on the priorities that are set by the [PUC], the mayor and the Board . . . . They are completely disconnected from the rate."

An annual budget resolution was passed for the fiscal year beginning July 1, 1999. The parties stipulated to toll the statute of limitations from July 1, 1999, to March 1, 2000. The Regents filed its action March 24, 2000. Thus, if the 1999 budget resolution, not the 1996 Board resolutions triggered the 120-day limitations period, then the Regents' action is timely filed, well within 120 days from the activation of the limitations period on March 1, 2000.

But the 1999 budget resolution did *not* trigger the limitations period. The 1996 Board resolutions did, as we now explain. The City correctly states in its respondent's brief, "Annual budget ordinances do not set rates." Rather,

the annual budget authorizes the expenditure of available revenues for each City fund, so that expenditures are balanced against the fund's anticipated revenue and surplus. If an annual budget resolution includes an increase in fees or rates, pertinent ordinances raising the rates must be submitted to the Board along with the budget. (San Francisco City Charter, § 9.101.)

█ The trial court properly concluded that the 1996 rate resolutions triggered the statute of limitations. Case law is clear that the enactment of a utility rate or rate increase, and not a subsequent act which actually imposes a utility charge, triggers the 120-day statute of limitations.

In *Indian Wells*, the court ruled the enactment of the utility ordinance, and not the mailing of a utility charge, was the limitations trigger. (*Indian Wells, supra,* 26 Cal.4th at pp. 1188, 1196.) "[A]n ordinance, resolution, or motion that unambiguously establishes a fee in excess of what the San Marcos Legislation permits is immediately subject to challenge when adopted. . . . [W]here the ordinance creating the fee clearly applies to public entities, it is the *enactment* of an improper fee, not the mailing of the charge, that violates [the Legislation]." (*Id.* at p. 1196.)

Likewise, in *Utility Cost Management* the court stressed that the enactment of the utility rate, not the payment by the customer, acted as the trigger. (*Utility Cost Management, supra,* 79 Cal.App.4th at pp. 1250–1252.) The court followed similar reasoning in *California Psychiatric Transitions, Inc. v. Delhi County Water Dist.* (2003) 111 Cal.App.4th 1156, 1163 [4 Cal.Rptr.3d 503].

We find *Trend Homes, Inc. v. Central Unified School Dist.* (1990) 220 Cal.App.3d 102 [269 Cal.Rptr. 349] (*Trend Homes*) to be particularly instructive. In that case the City of Fresno enacted an ordinance authorizing the imposition of fees on residential developers to alleviate the overcrowding of schools caused by the development. Several years later the Fresno City Council and the Central Unified School District passed resolutions which determined there was overcrowding. Some months later the City of Fresno and the school district reached Secured Agreements under which fees were imposed on developers. A developer sued, arguing the fees were invalid. (*Id.* at pp. 107–109.)

The court ruled that the 120-day limitations period was triggered by the original resolution which determined the existence of overcrowding. The court rejected the developer's argument that it was attacking the applicable Secured Agreements, and not an ordinance or resolution imposing fees: "The Secured Agreement would not have been entered into but for the resolutions of overcrowding . . . . Thus, although the resolutions did not levy the fees

directly, the resolutions were the source of the agreement which did. It is the validity of these resolutions that the complaint attacks. . . . The method of levying the fee, whether by resolution or by agreement pursuant to an earlier resolution, cannot logically affect the policy of providing prompt notice to financially constrained local agencies of challenges to their ability to collect fees and spend the revenues thereby generated." (*Trend Homes, supra,* 220 Cal.App.3d at p. 110.)

The present case is even stronger, because here the rate increases were actually imposed by the 1996 rate resolutions. Any user had the right to complain at that time and then take action against any allegedly excessive capital rate charges. The annual budget resolutions simply set forth how much of those increased rates would be spent that year. In other words, the capital fee set in 1996—which must involve facilities actually serving the Regents and must comply with the Implicit Price Deflator—remained the same for each ensuing year. All that changed was *how much* of the revenues from the capital fee would be allocated to capital *for any given year* due to complex budget concerns.

The Regents complain, in varying ways, that they could not tell how much of the increased rates, and how much of their regular utility charges, went to capital expenses. But the Regents knew the 1996 rate increases involved both capital and operations—and section 54999.3, subdivision (c), affords the Regents a "unique procedural right[]." (*Utility Cost Management, supra,* 79 Cal.App.4th at p. 1252.)

The statute permits the Regents to inquire of the City how much of any rate increase goes to capital. And the statute "requires public utilities, upon request or when imposing or increasing a capital facilities fee, to 'identify the amount of the capital facilities fee.' " (*Indian Wells, supra,* 26 Cal.4th at p. 1196.) The City would then have the burden of justifying the fee and proving it was not excessive. The statute "puts the burden on the utility imposing or increasing the fee to 'produc[e] evidence to establish . . . that the amount of the capital facilities fee does not exceed the amount necessary to provide capital facilities for which the fee is charged.' " (*Id.* at pp. 1196–1197.)

There is no indication the Regents availed themselves of this statute. When the City increased its rates in 1996—after considerable public dissemination of information and debate—the Regents had a right to ask the City exactly

how much of the increased rate went to capital. If that amount was arguably excessive, the Regents had a right to sue at that time. The Regents did not exercise that right in a timely fashion.[2]

In light of the unique procedural right provided by section 54999.3, subdivision (c), we see no unfairness to the Regents here. And we see none in the brevity of the limitations period itself. While a 120-day period is short for a statute of limitations, it is necessary for public policy reasons. As noted above, it enhances the budgetary stability by promptly informing them of fee challenges. As our Supreme Court has pointed out, it simply requires a certain vigilance on the part of the utility customer: public entities must "keep close watch on public utilities *at the time they adopt their rate ordinances and to bring prompt challenges*, perhaps without a final determination that the fee is excessive . . . ." (*Indian Wells, supra,* 26 Cal.4th at p. 1190, italics added.)

## IV. DISPOSITION

The summary judgment in favor of the City is affirmed.

Stein, J., and Swager, J., concurred.

A petition for a rehearing was denied February 19, 2004, and appellant's petition for review by the Supreme Court was denied June 9, 2004. Chin, J., did not participate therein.

---

[2] Even if one reads the statute to impose a duty to identify the capital facilities fee when increasing rates, there is no indication the Regents sought to enforce that duty or made a request for information, which is clearly authorized by the terms of the statute.