Filed 1/4/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DEPARTMENT OF FINANCE et al., | B292446 |
| Plaintiffs and Respondents, | |
| v. | (Los Angeles County Super. Ct. No. BS130730) |
| COMMISSION ON STATE MANDATES, | |
| Defendant and Respondent; | |
| COUNTY OF LOS ANGELES et al., | |
| Real Parties in Interest and Appellants. | |
| COUNTY OF LOS ANGELES et al., | |
| Cross-complainants and Appellants, | |
| v. | |
| COMMISSION ON STATE MANDATES, | |
| Cross-defendant and Respondent; | |
| DEPARTMENT OF FINANCE et al., | |
| Cross-Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of
Los Angeles County, Amy Hogue, Judge.  Reversed with directions.

Mary C. Wickham, County Counsel, Robert C. Cartwright, Assistant County Counsel, Michael S. Simon, Deputy County Counsel for Real Party in Interest, Cross-complainant and Appellant County of Los Angeles.

Burhenn & Gest LLP, David Burhenn, and Howard Gest for Real Parties in Interest, Cross-complainants and Appellants County of Los Angeles, City of Bellflower, City of Carson, City of Commerce, City of Downey, and City of Signal Hill.

Karl H. Berger, City Attorney, and Timothy E. Campen, Deputy City Attorney for Real Party in Interest, Cross-complainant and Appellant City of Bellflower.

Best Best & Krieger, Shawn D. Hagerty and Rebecca Andrews for County of San Diego, Cities of Carlsbad, Chula Vista, Coronado, Del Mar, El Cajon, Encinitas, Escondido, Imperial Beach, La Mesa, Lemon Grove, National City, Oceanside, Poway, San Marcos, Santee, Solana Beach, and Vista as Amici Curiae on behalf of Real Parties in Interest, Cross-complainants and Appellants.

Thomas E. Montgomery, County Counsel (San Diego), and Christina Snider, Deputy County Counsel, for California State Association of Counties as Amicus Curiae on behalf of Real Parties in Interest, Cross-complainants and Appellants.

Meyers, Nave, Riback, Silver & Wilson, Gregory J. Newmark and Bryan K. Brown for Alameda Countywide Clean Water Program as Amicus Curiae on behalf of Real Parties in Interest, Cross-complainants and Appellants.

Somach Simmons & Dunn, Theresa A. Dunham and Roberta Larson for California Stormwater Quality Association as Amicus Curiae on behalf of Real Parties in Interest, Cross-complainants and Appellants.

Xavier Becerra, Attorney General, Thomas S. Patterson, Assistant Attorney General, Tamar Pachter, Anthony R. Hakl,

Nelson R. Richards, and Ryan A. Hanley, Deputy Attorneys General for Plaintiffs, Cross-Real Parties in Interest and Respondents Department of Finance, State Water Resources Control Board, Regional Water Quality Control Board, Los Angeles Region.

No appearance for Defendant, Cross-defendant and Respondent Commission on State Mandates.

_____

The Regional Water Quality Control Board, Los Angeles Region (the Regional Board) issued a permit authorizing the County of Los Angeles (the County) and certain cities (collectively, the Operators) to operate stormwater drainage systems. The permit requires the Operators (1) to install and maintain trash receptacles at transit stops (the trash receptacle requirement) and (2) periodically inspect commercial facilities, industrial facilities, and construction sites to ensure compliance with various environmental regulatory requirements (the inspection requirements). Some of the Operators filed claims with the Commission on State Mandates (the Commission) seeking a determination that the state must reimburse them for the costs related to the trash receptacle and inspection requirements pursuant to article XIII B, section 6 of the California Constitution (section 6). The Commission determined that the trash receptacle requirement is a reimbursable state mandate and that the inspection requirements are not.

The Department of Finance, State Water Resources Control Board, and the Regional Board (collectively, the state agencies) filed a petition in the superior court for a writ of administrative mandamus to command the Commission to set aside its decision

3

concerning the trash receptacle requirement.[1]  The County and the Cities of Bellflower, Carson, Commerce, Covina, Downey, Signal Hill (collectively, the local governments) filed a cross-petition challenging the Commission's decision as to the inspection requirements.  The superior court granted the state agencies' petition and denied the cross-petition as moot.  The local governments appealed.  We agree with the Commission that the trash receptacle requirement requires subvention and the inspection requirements do not.  We therefore reverse the judgment of the superior court.

## FACTUAL AND PROCEDURAL SUMMARY

In December 2001, the Regional Board issued its permit No. 01-182 (the permit) concerning waste discharge requirements for municipal stormwater and urban runoff discharges within Los Angeles County and certain cities in the Los Angeles County Flood Control District.  The permit includes the trash receptacle requirement[2] and inspection requirements.[3]

---

[1] The state agencies identified as real parties in interest: County of Los Angeles and the Cities of Artesia, Azusa, Bellflower, Beverly Hills, Carson, Commerce, Covina, Downey, Monterey Park, Norwalk, Rancho Palo Verdes, Signal Hill, Vernon, and Westlake Village.

[2] The trash receptacle requirement is set forth in part 4.f.5.c.3 of the permit, which provides that the Operators shall "[p]lace trash receptacles at all transit stops within its jurisdiction" and that "[a]ll trash receptacles shall be maintained as necessary."

[3] The inspection requirements were summarized by our Supreme Court in *Department of Finance v. Commission on State Mandates* (2016) 1 Cal.5th 749 (*Department of Finance*) as follows:

4

In 2003, the local governments, among others, filed test claims[4] with the Commission seeking subvention of funds to cover the costs of the trash receptacle and inspection requirements pursuant to section 6.[5]  That section provides generally that

"As to commercial facilities, [the permit] required each Operator to inspect each restaurant, automotive service facility, retail gasoline outlet, and automotive dealership within its jurisdiction, and to confirm that the facility employed best management practices in compliance with state law, county and municipal ordinances, a Regional Board resolution, and the Operators' stormwater quality management program (SQMP).  For each type of facility, the [p]ermit set forth specific inspection tasks.

"[The permit] addressed industrial facilities, requiring the Operators to inspect them and confirm that each complied with county and municipal ordinances, a Regional Board resolution, and the SQMP.  The Operators also were required to inspect industrial facilities for violations of the general industrial activity stormwater permit, a statewide permit issued by the State [Water Resources Control] Board that regulates discharges from industrial facilities." (*Department of Finance, supra,* 1 Cal.5th at p. 758, fn. 5.)

"[The permit] required inspections for violations of the general construction activity stormwater permit, another statewide permit issued by the State Board." (*Department of Finance*, *supra*, 1 Cal.5th at p. 758, fn. 6.)

[4] A " '[t]est claim' " is "the first claim filed with the [C]ommission alleging that a particular statute or executive order imposes costs mandated by the state." (Gov. Code, § 17521.)  The Commission's adjudication of the test claim "governs all subsequent claims based on the same statute." (*City of San Jose v. State of California* (1996) 45 Cal.App.4th 1802, 1807.)

[5] Additional procedural and background facts regarding the permit and the test claims not necessary to our decision are described in *County of Los Angeles v. State Water Resources*

5

the state must reimburse local governments for the costs of any state-mandated "new program or higher level of service." (Cal. Const., art. XIII B, § 6, subd. (a).) This general rule does not apply under certain circumstances, such as when the requirement is mandated by federal law or the local agency has the authority to levy fees sufficient to pay for the program or increased level of service. (Gov. Code, § 17556, subds. (c) & (d).)

In July 2009, the Commission determined that the challenged requirements imposed new programs or higher levels of service within the meaning of section 6. Because no exception applied to the trash receptacle requirement, subvention was required to reimburse the local governments for the cost of complying with the requirement. The Commission determined that subvention was not required for the cost of complying with the inspection requirements, however, because the local governments have the authority to impose fees that could pay for the required inspections. (See Gov. Code, § 17556, subd. (d).)

In February 2011, the state agencies filed a petition for writ of administrative mandamus challenging the Commission's decision on three grounds: (1) the challenged requirements are mandated by federal law; (2) the challenged requirements do not impose new programs or higher levels of service; and (3) subvention for the costs of complying with the trash receptacle requirement is not required because the local governments have authority to levy fees to cover such costs. The local governments filed a cross-petition challenging the Commission's determination that the local governments could levy fees to cover the costs of the required inspections.

_____

*Control Bd.* (2006) 143 Cal.App.4th 985, *County of Los Angeles v. Commission on State Mandates* (2007) 150 Cal.App.4th 898, and *Department of Finance, supra,* 1 Cal.5th 749.

6

In August 2011, the trial court granted the state agencies' petition on the ground that the challenged conditions impose requirements mandated by federal law and, therefore, the costs of complying with the requirements are not reimbursable. (See Gov. Code, § 17556, subd. (c).) The court did not address the other arguments by the state agencies or the local governments' cross-petition. After we affirmed the court's decision in October 2013, the Supreme Court reversed. (*Department of Finance, supra,* 1 Cal.5th at p. 772.)

The Supreme Court held that the federal mandate exception did not apply to the challenged requirements. (*Department of Finance, supra,* 1 Cal.5th at pp. 771–772.) The Court directed the trial court to address the remaining issues raised by the petition and cross-petition. (*Id.* at p. 772.)

In February 2018, the trial court again granted the state agencies' petition, this time on the ground that neither the trash receptacle requirement nor the inspection requirements are state mandated programs within the meaning of section 6. The local governments' cross-petition was therefore moot. The court did not reach the parties' arguments concerning the local governments' authority to levy fees to pay for the costs of implementing the requirements.

The local governments timely appealed.

The parties briefed issues arising from the trial court's ruling that the trash receptacle requirement and inspection requirements are not state mandates. In June 2020, we requested the parties further brief the questions whether the Commission erred in finding that (1) the costs of the trash receptacle requirement are costs mandated by the state, and (2) the costs of the challenged inspection requirements are not costs mandated by the state. In October 2020, we requested further supplemental

7

briefing to address the questions whether Health and Safety Code section 5471 or Government Code section 54999.7 provide the local governments with the authority to levy service charges, fees, or assessments sufficient to pay for the trash receptacle requirement. We received and have considered the requested supplemental briefs.

## DISCUSSION

### A.     Standards of Review

"[T]he Commission, as a quasi-judicial body, has the sole and exclusive authority to adjudicate whether a state mandate exists." (*County of Los Angeles v. Commission on State Mandates* (1995) 32 Cal.App.4th 805, 819.)  Review of its decisions is by writ of administrative mandamus to the trial court.  (Gov. Code, § 17559, subd. (b).)  On appeal from the trial court's decision, our review of disputed factual determinations is the same as "the trial court, that is, to review the administrative decision to determine whether it is supported by substantial evidence on the whole record."  (*County of Los Angeles v. Commission on State Mandates, supra*, 32 Cal.App.4th at p. 814; accord, *Paradise Irrigation Dist. v. Commission on State Mandates* (2019) 33 Cal.App.5th 174, 185 (*Paradise Irrigation*).)  However, we "independently review[ ] conclusions as to the meaning and effect of constitutional and statutory provisions" and, more particularly, the determination that the permit conditions are state mandates.  (*Department of Finance, supra*, 1 Cal.5th at p. 762.)

## B.    New Program or Higher Level of Service[6]

In 1979, the California electorate added article XIII B to our state constitution.  That article generally "restricts the amounts state and local governments may appropriate and spend each year from the 'proceeds of taxes.' " (*City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 58–59.)  The drafters of the initiative perceived that the restriction on state government spending could result in attempts by legislators seeking to establish or expand a government program to require local governments implement the desired program, thus effectively

---

[6] In *Department of Finance*, the Supreme Court noted that the state agencies and the local governments "d[id] not dispute here that each challenged requirement is a new program or higher level of service." (*Department of Finance*, *supra*, 1 Cal.5th at p. 762.)  The local governments contend that this statement "could be treated as law of the case"; that is, that the Supreme Court implicitly decided that the trash receptacle and inspection requirements are new programs or higher levels of service.  Under the law of the case doctrine, " ' "an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case." [Citation.]' [Citation.] 'Generally, the doctrine of law of the case does not extend to points of law which might have been but were not presented and determined in the prior appeal.' " (*Leider v. Lewis* (2017) 2 Cal.5th 1121, 1127.)  The Supreme Court's statement in *Department of Finance* as to an issue that the parties did not dispute does not constitute "a rule of law necessary to the decision of the case."  Although an exception to this rule applies when a question is implicitly decided because it was essential to the appellate court's decision, the general rule and not the exception apply here.  We therefore reject the argument that the Supreme Court has decided the issues before us.

9

shifting the financial responsibility for the program to the local governments.  (*County of Los Angeles v. State of California* (1987) 43 Cal.3d 46, 56*; County of Fresno v. State of California* (1991) 53 Cal.3d 482, 487.)  To protect local governments from such attempts, the drafters included section 6, which provides that "[w]henever the Legislature or any state agency mandates a new program or higher level of service on any local government, the [s]tate shall provide a subvention of funds to reimburse that local government for the costs of the program or increased level of service."  (Cal. Const., art. XIII B, § 6, subd. (a); see *Department of Finance, supra,* 1 Cal.5th at p. 769.)  "As a result, the state . . . , with certain exceptions, must ' "pay for any new governmental programs, or for higher levels of service under existing programs, that it imposes upon local governmental agencies." ' "  (*County of San Diego v. Commission on State Mandates* (2018) 6 Cal.5th 196, 207.)

The phrase "higher level of service" in section 6 refers to "state mandated increases in the services provided by local agencies in existing 'programs.' "  (*County of Los Angeles v. State of California, supra,* 43 Cal.3d at p. 56.)  Whether a program is "new" or provides a "higher level of service" is determined by comparing the legal requirements before and after the issuance of the executive order or the change in law.  (See, e.g., *San Diego Unified School Dist. v. Commission on State Mandates* (2004) 33 Cal.4th 859, 878 (*San Diego U.S.D.*); *Lucia Mar Unified School Dist. v. Honig* (1988) 44 Cal.3d 830, 835.)

The term, "program," is not defined in section 6.  Our Supreme Court has established a two-part definition.  Programs, for purposes of section 6, are "programs that carry out the governmental function of providing services to the public, or laws which, to implement a state policy, impose unique requirements on local governments and do not apply generally to all residents and

10

entities in the state." (*County of Los Angeles v. State of California*, *supra*, 43 Cal.3d at p. 56.) The two parts are alternatives; either will trigger the subvention obligation unless an exception applies. (*Carmel Valley Fire Protection Dist. v. State of California* (1987) 190 Cal.App.3d 521, 537 (*Carmel Valley*).)

State mandates that satisfy the first part of the definition— i.e., the program carries out a governmental function of providing services to the public—are illustrated in a line of cases that includes *San Diego U.S.D., supra,* 33 Cal.4th 859, *Carmel Valley*, *supra*, 190 Cal.App.3d 521, and *Long Beach Unified Sch. Dist. v. State of California* (1990) 225 Cal.App.3d 155 (*Long Beach*).

In *San Diego U.S.D.*, the court considered a state law that required public school principals to suspend immediately any student who possesses a firearm at school and make a recommendation to the school district board that the student be expelled. (*San Diego U.S.D.*, *supra*, 33 Cal.4th at pp. 867–871.) In that situation, the law further requires that the suspended student be entitled to a hearing and other procedural protections prior to expulsion. (*Id.* at p. 866.) The San Diego Unified School District contended that the cost associated with such procedural protections were reimbursable under section 6, and the Supreme Court agreed. (*Id.* at pp. 877–878.) The new law required subvention because "public schooling . . . constitutes a governmental function" (*id.* at p. 879), and the mandatory suspension of students who possess firearms provided "a 'higher level of service' to the public," specifically, safer schools for other students. (*Id.* at p. 878.)

In *Carmel Valley*, the County of Los Angeles sought reimbursement from the state for the increased costs of complying with an executive order that established minimum requirements for protective clothing and equipment for firefighters. (*Carmel Valley*,

11

*supra*, 190 Cal.App.3d at pp. 530–531.)  The Court of Appeal stated that firefighting is a "peculiarly governmental function" that provides services to the public and held that the cost of complying with the new requirements required subvention under section 6. (*Id.* at p. 537.)  The Supreme Court later explained the holding in *Carmel Valley* by stating that subvention was required in that case because the "increased safety equipment apparently was designed to result in more effective fire protection" and thus "intended to produce a higher level of service to the public." (*San Diego U.S.D.*, *supra*, 33 Cal.4th at p. 877.)

In *Long Beach*, a school district sought subvention under section 6 for costs associated with an executive order that required school districts to " 'develop and adopt a reasonably feasible plan for the alleviation and prevention of racial and ethnic segregation of minority students.' " (*Long Beach, supra*, 225 Cal.App.3d at p. 165.) Although school districts had an existing "constitutional obligation to alleviate racial segregation," the "specific actions" required by the executive order constituted a "higher level of service" requiring reimbursement under section 6. (*Id.* at p. 173.)

Turning to the instant case, there are three pertinent governmental functions implicated by the challenged requirements for purposes of section 6:  The operation of stormwater drainage and flood control systems; the installation and maintenance of trash receptacles at transit stops; and the inspection of commercial, industrial, and construction facilities and sites to ensure compliance with environmental laws and regulations.  The first existed prior to the Regional Board's permit; the other two are new.  Each is a governmental function that provides services to the public, and the carrying out of such functions are thus programs under the first part of the Supreme Court's definition of that term.

12

In the case of the provision of stormwater drainage and flood control services, the trash receptacle requirement provides a higher level of service because it, together with other requirements, will reduce pollution entering stormwater drainage systems and receiving waters. In addition, litter will presumably be reduced at transit stops and adjacent streets and sidewalks; as the local governments put it, the "community is cleaner as a result."

The inspection requirements provide a higher level of service because they promote and enforce third party compliance with environmental regulations limiting the amount of pollutants that enter storm drains and receiving waters.

Alternatively, the trash receptacle services and inspections can be viewed, as the Commission viewed them, as government functions that provide services to the public. That is, even if the installation and maintenance of trash receptacles at transit stops does not result in a higher level of stormwater drainage and flood control services, trash collection is itself a government function that provides a service to the public by producing cleaner transit stops, sidewalks, streets, and, ultimately, stormwater drainage systems and receiving waters. Under this view, the mandate to install and maintain trash receptacles at transit stops is a "new program" within the meaning of section 6 because it was not required prior to the Regional Board's issuance of the permit. Similarly, the inspection requirements not only increase the level of service provided by the existing stormwater drainage and flood control system, but also constitute new programs mandated by the state to ensure third party compliance with environmental regulations.

The challenged requirements also meet the alternative test of a "program"—i.e., a law or order that "impose[s] unique requirements on local governments" "to implement a state policy." (*County of Los Angeles v. State of California, supra*, 43 Cal.3d at

13

p. 56.)  This alternative was addressed in *County of Los Angeles v. Department of Industrial Relations* (1989) 214 Cal.App.3d 1538. In that case, the California Occupational Safety and Health Administration promulgated new earthquake and fire safety regulations concerning elevators.  (*Id.* at p. 1540.)  The County of Los Angeles, which owns buildings with elevators, filed a claim for reimbursement for the cost of complying with the regulations. The Court of Appeal affirmed the trial court's rejection of the claim, holding that the regulations did not impose a unique requirement on local governments because the regulations applied "to all elevators, not just those which are publicly owned."  (*Id.* at p. 1545.)

A similar result was reached in *County of Los Angeles v. State of California, supra*, 43 Cal.3d 46, where the enactment of laws that increased the amounts that all employers, including local governments, must pay in worker's compensation benefits, did not impose unique requirements on local governments.  (*Id.* at pp. 57–58.)  By contrast, the requirements for protective clothing and equipment for firefighters in *Carmel Valley* imposed unique requirements on local agencies because they applied "only to those involved in fire fighting" and "fire fighting is overwhelmingly engaged in by local agencies."  (*Carmel Valley, supra*, 190 Cal.App.3d at p. 538; see also *San Diego U.S.D., supra*, 33 Cal.4th at p. 877 [law requiring procedural protections prior to student expulsion imposed unique requirements on school districts].)

The pertinent state policy, as expressed in the Regional Board's permit, is "to protect the beneficial uses of receiving waters in Los Angeles County" and "reduce the discharge of pollutants in storm water to the maximum extent practicable."  The challenged requirements are unique to local governments in two ways.  First, as the Commission found, the Regional Board's permit applies by its terms only to the local governmental entities identified in the

14

permit; no one else is bound by it. Second, the activities compelled by the challenged requirements—collecting trash at transit stops and inspecting businesses and construction sites to ensure environmental regulatory compliance—are, like the firefighting services in *Carmel Valley*, typically within the purview of government agencies. The requirements therefore constitute programs within the meaning of both alternative definitions. By requiring the local governments to comply with the trash receptacle and inspection requirements, the state agencies have effectively shifted the financial responsibility for such programs to the local governments.

The trial court agreed with the state agencies that the trash receptacle and inspection requirements are mere manifestations of policies to prohibit pollution. As the trial court stated, the requirements "enforce a prohibition rather than initiate or upgrade 'classic' or 'peculiarly governmental functions[s]' like the firefighting services affected by the executive order in *Carmel Valley*. . . . Because the requirements were implemented to prevent pollution (enforce a ban on pollution) rather than to provide a service to the public, it is difficult to regard them as 'programs that carry out the governmental function of providing services to the public.'" This view, however, ignores the terms of the Regional Board's permit; the challenged requirements are not bans or limits on pollution levels, they are mandates to perform specific actions—installing and maintaining trash receptacles and inspecting business sites—that the local governments were not previously required to perform. Although the purpose of requiring trash collection at transit stops and business site inspections was undoubtedly to reduce pollution in waterways, the state sought to achieve that goal by requiring local governments to undertake new

15

affirmative steps resulting in costs that must be reimbursed under section 6.

Lastly, the state agencies assert that the challenged requirements are not state mandates because the local governments applied for the permit to operate their stormwater drainage systems and "chose a management permit rather than a numeric end-of-pipe permit." That is, although the local governments could arguably have applied for a permit that simply mandated particular effluent limits on discharges—a so-called end-of-pipe permit—they elected to apply for a "management permit," which imposes requirements designed to reduce the discharge of pollutants to the maximum extent practicable. (See *City of Abilene v. U.S. E.P.A.* (5th Cir. 2003) 325 F.3d 657, 659–660; 33 U.S.C. § 1342(p)(3)(B)(iii).) "Having elected a management permit that imposes the challenged conditions in lieu of more rigid requirements," the state agencies argue, the local governments "should not be allowed to force the [s]tate to pay for that choice."

The state agencies rely on *Department of Finance v. Commission on State Mandates* (2003) 30 Cal.4th 727 (*Kern High School District*). In that case, the Supreme Court held that school districts that voluntarily elect to participate in particular education-related programs were not entitled to subvention for costs required by such programs. (*Id.* at p. 743.) This holding does not apply here, however, because, as our Supreme Court explained, the local governments are required under federal and state law to obtain a permit "for any discharge from a municipal storm sewer system serving a population of 100,000 or more." (*Department of Finance*, *supra*, 1 Cal.5th at p. 757.) The permit "must effectively prohibit non-stormwater discharges into the storm sewers, and must 'require controls to reduce the discharge of pollutants to the maximum extent practicable.' " (*Ibid.*, italics omitted.) Although

16

the storm sewer system operator must propose "management practices; control techniques; and system, design, and engineering methods to reduce the discharge of pollutants to the maximum extent practicable," it is the "permit-issuing agency" that "determine[s] which practices, whether or not proposed by the applicant, will be imposed as conditions." (*Ibid.*) Thus, as the Commission concluded, in contrast to the school districts' participation in educational programs in *Kern High School District*, the local governments in the instant case "[did] not voluntarily participate" in applying for a permit to operate their stormwater drainage systems; they were required to do so under state and federal law and the challenged requirements were mandated by the Regional Board.

### C. Whether the Local Government Can Levy Fees or Assessments to Pay for the Programs

Under Government Code section 17556, subdivision (d), when, as here, the state imposes on local governments a new program or higher level of service, the state is not required to provide subvention to the local government if the local government "has the authority to levy service charges, fees, or assessments sufficient to pay for the mandated program or increased level of service." (Gov. Code, § 17556, subd. (d).) The state agencies have the burden of demonstrating the applicability of statutory exceptions to the subvention requirement. (*Department of Finance*, *supra*, 1 Cal.5th at p. 769.)

Here, the Commission determined that the local governments have the authority to levy service charges, fees, or assessments sufficient to pay for the inspection requirements, but not for the trash receptacle requirement. We agree with the Commission.

17

### 1.    *The Inspection Requirements*

Under article XI, section 7 of our state constitution, a "county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."  (Cal. Const., art. XI, § 7.)  These powers are known generally as the police powers of local government.  (*City and County of San Francisco v. Regents of University of California* (2019) 7 Cal.5th 536, 544.)  The parties do not dispute that the challenged inspection requirements are within the government's police power.  (See *Freeman v. Contra Costa County Water Dist.* (1971) 18 Cal.App.3d 404, 408 ["prevention of water pollution is a legitimate governmental objective, in furtherance of which the police power may be exercised"]; *Cowing v. City of Torrance* (1976) 60 Cal.App.3d 757, 764 [local government may enter business property to make reasonable inspection for compliance with public health and safety regulations]; *Sullivan v. City of Los Angeles* (1953) 116 Cal.App.2d 807, 811 [city officials may inspect private property for compliance with sewage regulations].)

The police power also includes the authority to impose a regulatory fee to further the purpose of a valid exercise of that power.  (*Mills v. County of Trinity* (1980) 108 Cal.App.3d 656, 662.)  The services for which a regulatory fee may be charged include those that are " 'incident to the issuance of [a] license or permit, investigation, inspection, administration, maintenance of a system of supervision and enforcement.' "  (*California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 945.)

A regulatory fee is valid "if (1) the amount of the fee does not exceed the reasonable costs of providing the services for which it is charged, (2) the fee is not levied for unrelated revenue purposes, and (3) the amount of the fee bears a reasonable relationship to

the burdens created by the fee payers' activities or operations" or the benefits the fee payers receive from the regulatory activity. (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1046, citing *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 881.) The third element is a question "of fair allocation" that "considers whether any class of fee payers is shouldering too large a portion of the associated regulatory costs." (*California Building Industry Assn. v. State Water Resources Control Bd.*, *supra*, at p. 1052.) "Whether a statute imposes a fee or a tax is a question of law to be decided upon an independent review of the record." (*Id.* at p. 1046.)

Here, we are not faced with the question whether any ordinance imposing a fee on businesses to cover the local governments' inspection costs constitutes a tax or regulatory fee; the issue is whether the local governments have the authority to levy such a fee "sufficient to pay for the mandated program or increased level of service." (Gov. Code, § 17556, subd. (d).) We agree with the Commission that, based upon the local governments' constitutional police power and their ability to impose a regulatory fee that (1) does not exceed the reasonable cost of the inspections, (2) is not levied for unrelated revenue purposes, and (3) is fairly allocated among the fee payers, the local governments have such authority.[7]

The local governments contend that they could not impose a fee for the costs of the inspections as to some businesses because the state already imposes a fee for industrial and construction

---

[7] The state agencies also assert that the local governments have the authority to levy charges to pay for the inspections under section 5471 of the Health and Safety Code. Because we hold that the police power under the constitution provides such authority, we do not address this issue.

site inspections, and the local governments are "constitutionally constrained from imposing a second fee for those same inspections." Specifically, the local governments contend that the owners of some of the sites they must inspect pay fees to the state, a portion of which the Regional Board must spend "solely on stormwater inspection and regulatory compliance issues associated with industrial and construction stormwater programs." (Wat. Code, § 13260, subd. (d)(2)(B)(iii).) They argue that any regulatory fee the local governments impose for their inspections would duplicate the fees paid to the state and thus (1) exceed the reasonable cost of providing services for which the fee is charged and (2) not bear a fair or reasonable relationship to the pertinent burdens or benefits.[8] This argument assumes that the local government's inspection would replace or supplant inspections the Regional Board is required to conduct. The local governments, however, do not cite to the record or authority to support that assumption. Although Water Code section 13260 requires that regional boards use a portion of the fees they receive from certain waste dischargers for "stormwater inspection and regulatory compliance issues associated with industrial and construction stormwater programs" (Wat. Code, § 13260, subd. (d)(2)(B)(iii)), nothing in the statute requires a regional board to inspect a fee payer's site. Thus, the permit's inspection requirements and Water Code section 13260 can be applied without duplication or conflict; the local governments can impose and collect a fee to cover the reasonable costs of the particular inspections they are required to undertake and

---

[8] We do not express any view as to whether a particular fee a local government could impose would either exceed the reasonable cost of providing the services for which the fee is charged or not bear a fair or reasonable relationship to the payor's burdens or benefits from the inspection.

20

the Regional Board can fulfill its expenditure requirements by addressing "stormwater inspection and regulatory compliance issues" in other ways.  (Wat. Code, § 13260, subd. (d)(2)(B)(iii).)

The local governments further argue that, because any regulatory fee they could impose to pay for the required inspections would be duplicative of the fee some businesses are required to pay to the state under Water Code section 13260, the local government fee would be void under principles of preemption.  We disagree.

Under the doctrine of preemption, a local ordinance that conflicts with state law is preempted by the state law and void. (*O'Connell v. City of Stockton* (2007) 41 Cal.4th 1061, 1067.)  Such a " ' "conflict exists if the local legislation ' "*duplicates, contradicts,* or *enters an area fully occupied* by general law, either expressly or by legislative implication." ' " ' "  (*Ibid.*)  "A local ordinance *duplicates* state law when it is 'coextensive' with state law."  (*Ibid.*)

The local governments have failed to show how a fee it could impose to pay for the required inspections conflicts with state law, specifically, Water Code section 13260.  As discussed above, that statute obligates the waste dischargers described in that statute to pay annual fees to the state, and requires some of those fees be used for "stormwater inspection and regulatory compliance issues." (Wat. Code, § 13260, subd. (d)(2)(B)(iii).)  There is nothing in our record to indicate that a local government's inspection fee would necessarily duplicate the annual fees imposed under Water Code section 13260; the local government fee would pay for the costs of the local government's inspection and the fees paid to the state could be used for the activities required or permitted under state law other than the local government's inspection.  Nor does any provision within Water Code section 13260 imply that the Legislature intended to "occupy the field" of stormwater program inspections or inspection fees.  Indeed, the Porter-Cologne Water

21

Quality Control Act (Wat. Code, §§ 13000–16104), which includes Water Code section 13260, provides that its provisions do not limit "the power of a city or county . . . to adopt and enforce additional regulations, not in conflict therewith, imposing further conditions, restrictions, or limitations with respect to the disposal of waste or any other activity which might degrade the quality of the waters of the state." (Wat. Code, § 13002, subd. (a).) We therefore reject the local government's preemption arguments.

The local governments also argue that a fee that must be no more than necessary to cover the reasonable costs of the inspections "would be difficult to accomplish." They refer to problems that would arise from a general business license fee on all businesses, including those not subject to inspection, and to charging fees for inspections in years in which no inspection would take place. Even if we assume that drafting or enforcing a law that imposes fees to pay for inspections would be difficult, the issue is whether the local governments have the authority to impose such a fee, not how easy it would be to do so. (*Connell v. Superior Court* (1997) 59 Cal.App.4th 382, 401.) As explained above, the police powers provision of the constitution and the judicial authorities we have cited provide that authority. Moreover, as the Commission pointed out, at least one city—Covina—has enacted "stormwater inspection fees on [commercial establishments] . . . expressly for the purpose of complying with the permit."

## 2. *The Trash Receptacle Requirement*

The Commission determined that the local governments do not have the authority to levy charges, fees, or assessments to cover the costs of the trash receptacle requirement. In part, the Commission reasoned that, "[b]ecause the trash receptacles are required to be placed at transit stops that would typically be on

22

city property (sidewalks) or transit district property (for bus, metro, or subway stations), there are no entities on which the [local governments] would have authority to impose the fees."**9** (Fn. omitted.)  The trash receptacle requirement, therefore, requires subvention under section 6.  The state agencies challenge this determination.

In their initial appellate brief addressing this issue, the state agencies asserted that the local governments could have charged a fee to transit agencies or transit riders.  They made the assertion, however, without citation to authority or evidence.  We requested that the parties brief the question whether the local governments have authority to charge a fee to transit agencies pursuant to Government Code section 54999.7.  In response the state agencies argue that this statute provides such authority; the local governments contend it does not.

Government Code section 54999.7, subdivision (a) provides: "Any public agency providing public utility service may impose a fee, including a rate, charge, or surcharge, for any product, commodity, or service provided to a public agency, and any public agency receiving service from a public agency providing public utility service shall pay that fee so imposed.  Such a fee for public utility service, other than electricity or gas, shall not exceed the

---

**9** It is not clear from our record whether the local governments have authority to install and maintain trash receptacles on property they do not own, including property owned by transit authorities.  When counsel for the Regional Board was asked at a hearing before the Commission about the ability of the local governments to fulfill the trash receptacle requirement with respect to transit authority property, counsel suggested that the local governments could work "cooperatively" with transit authorities to implement the requirement.

reasonable cost of providing the public utility service."  We agree with the local governments that their installation and maintenance of trash receptacles at transit stops pursuant to the permit is not a service "provided to a public agency" within the meaning of the statute.

The Legislature enacted Government Code sections 54999 through 54999.7 to address fee disputes among public utilities, such as water districts, and public agencies that received the services, such as school districts and state universities.  (Assem. Floor Analysis, Assem. Bill No. 2951 (2005-2006 Reg. Sess.) as amended Aug. 29, 2006, pp. 3–7.)  These disputes and the Legislature's responses have been shaped by the Supreme Court's decision in *San Marcos Water Dist. v. San Marcos Unified School Dist.* (1986) 42 Cal.3d 154 (*San Marcos*).  In that case, a school district connected its facilities to the water district's sewer system and paid monthly service fees, which were not disputed.  (*Id.* at pp. 158, 167.)  The water district, however, also charged a "capacity fee" to pay for capital improvements to the sewer system, which the school district challenged.  (*Id.* at pp. 157–158.)  The Supreme Court held that the capacity fee constituted an assessment, which the school district, as a public agency, was not required to pay.  (*Id.* at pp. 164–165.)  The court rejected the argument that the capacity fee was similar to a usage fee, which is " 'voluntary'—in the sense that it is the payer's solicitation and utilization of the [public utility] service which triggers the charge."  (*Id.* at p. 161.)  A usage fee, the court noted, "typically is charged only to those who use the goods or services" and "is related to the actual goods or services provided to the payer."  (*Id.* at p. 162.)  The capacity fee, by contrast, was an "involuntary" assessment, which the school district did not agree to pay and the water district could not lawfully impose on its public entity customers.  (*Ibid.*)

24

In 1988, the Legislature responded to the *San Marcos* decision by enacting Government Code sections 54999 through 54999.6—what courts have referred to as the *San Marcos* legislation.  (*Utility Cost Management v. Indian Wells Valley Water Dist.* (2001) 26 Cal.4th 1185, 1189 (*Utility Cost Management*); *Regents of University of California v. City and County of San Francisco* (2004) 115 Cal.App.4th 1109, 1111 (*Regents*).)  The *San Marcos* legislation authorized public utilities to charge their public entity customers a "capital facilities fee" and required the public entities "receiving a public utility's service" to pay the fee.  (Gov. Code, § 54999.2.)  Subsequent litigation among public utilities and public agencies led the Legislature in 2006 to "fine-tune[ ]" the statutory scheme by adding section 54999.7.  (Assem. Floor Analysis, Assem. Bill No. 2951 (2005-2006 Reg. Sess.) as amended Aug. 29, 2006, p. 7.)  In addition to subdivision (a) of section 54999.7, quoted above, subdivision (b) requires the public utility to determine the amount of the fee for service provided to a public agency based on "the same objective criteria and methodology applicable to comparable nonpublic users, based on customer classes established in consideration of service characteristics, demand patterns, and other relevant factors." (Gov. Code, § 54999.7, subd. (b).)

Although *San Marcos* and the legislation it evoked clarified the type of fees a public utility can charge public entities, the legislation contemplates that the public entity to whom the service is provided has generally agreed to receive the utility's services; that is, the public entity is a voluntary customer of the public utility.  (See Assem. Floor Analysis, Assem. Bill No. 2951 (2005-2006 Reg. Sess.) as amended Aug. 29, 2006, p. 3 [Government Code section 54999.7 "authorizes a public agency utility to charge public agency customers rates or charges on

25

the same basis as comparable nonpublic users, except for capital facilities fees"].) Thus, judicial decisions addressing the statutory scheme have arisen from disputes between public utilities and their customers. (See *Utility Cost Management*, *supra*, 26 Cal.4th at pp. 1188, 1194 [assignee of Kern Community College District—a "customer" of the defendant water district—sued to recover sums allegedly charged in excess of limits under Government Code section 54999.3]; *Regents*, *supra*, 115 Cal.App.4th at p. 1111 [University of California Regents sued provider of water and sewer services in case that "involves setting and collecting proper charges for public entities as customers of public utilities"].)

Viewed in this light, Government Code section 54999.7's reference to the power of one public agency to impose a fee for a public utility service "provided to [another] public agency" contemplates that the receiving public agency is a public utility customer that solicited and uses the services for which it is charged. The statute does not permit one public entity to simply install equipment—such as trash receptacles—on another public entity's premises and then charge the other entity for their installation and ongoing maintenance. We therefore reject the state agencies' argument that the statute authorizes the local governments to impose on transit agencies service charges, fees, or assessments to pay the costs of complying with the trash receptacle requirement.

The state agencies focus their argument on the assertion that the local governments could levy a fee on property owners "in accordance with the burdens created and benefits enjoyed by each parcel." As the state agencies acknowledge, levying a charge, fee, or assessment on property owners implicates article XIII D of our state constitution, enacted in 1996 as Proposition 218. That article places procedural and substantive requirements on charges, fees, and assessments on real property. Procedurally,

26

article XIII D of the California Constitution provides generally for protest procedures and voter approval for fees and charges. (Cal. Const., art. XIII D, § 6, subds. (a) & (c).)  Substantively, a fee or charge may not be imposed on a parcel or upon a person as an incident of property ownership unless, among other requirements, the fee or charge "[does] not exceed the proportional cost of the service attributable to the parcel," the fee or charge is for a service that "is actually used by, or immediately available to, the owner of the property in question," and it is not "imposed for general governmental services."  (Cal. Const., art. XIII D, § 6, subd. (b)(3)-(5).)

The state agencies discuss at some length how the procedural requirements under article XIII D of the California Constitution do not apply to fees for sewer and refuse collection services and, if they do apply, they do not negate the local government's authority to impose fees and charges to pay for the trash receptacle.  (See Cal. Const., art XIII D, § 6, subd. (d); §§ 53750, subd. (k), 53751, subd. (*l*); *Paradise Irrigation*, *supra*, 33 Cal.App.5th at p. 194) They address only briefly, and unpersuasively, the substantive requirements that the trash collection service for which the fee or charge would be imposed must be used by or immediately available to the property in question and the fee cannot exceed the cost attributable to the parcel that is charged.

Under the state agencies' theory, the local governments can charge any property owner "in the vicinity of the trash receptacles" installed at bus stops for the cost of collecting trash at the bus stop.  The adjacent property owners, they argue, would benefit by the reduction of trash on the streets and sidewalks next to their properties.

Even if we assume that a fee imposed on adjacent property owners for trash collection at transit stops could overcome

27

the procedural hurdles applicable to most fees, charges, and assessments imposed on property owners (see Cal. Const., art. XIII D, §§ 4, 6), the proponent of the fee would have to establish that the fee is for a service that is to some extent "attributable to the parcel," that the "service is actually used by, or immediately available to, the owner of the property," and that the service is not "for general governmental services . . . where the service is available to the public at large in substantially the same manner as it is to property owners." (*Id.*, art. XIII D, § 6, subd. (b)(3)–(5).) In a dispute between the property owner and a local government that has imposed such a fee, the local government would have the burden of proof on that issue. (*Id.*, art. XIII D, § 6, subd. (b)(5); *Moore v. City of Lemon Grove* (2015) 237 Cal.App.4th 363, 368.) In the procedural situation in this case, however, it is the state agencies that are asserting that the local governments have authority to impose such a fee; they therefore have the burden of proving that the local governments could satisfy these tests. (Cf. *Department of Finance*, *supra*, 1 Cal.5th at p. 769 [party claiming the applicability of federal mandate exception to subvention "bears the burden of demonstrating that it applies"].)

The state agencies have not satisfied their burden. Not only have the state agencies failed to cite to the record or authority to support the point that a fee imposed on property owners adjacent to transit stops could satisfy the substantive constitutional requirements, but common sense dictates that the vast majority of persons who would use and benefit from trash receptacles at transit stops are not the owners of adjacent properties but rather pedestrians, transit riders, and other members of the general public; any benefit to property owners in the vicinity of bus stops would be incidental. Even if the state agencies could establish that the need for the trash receptacles is in part attributable to adjacent

28

property owners and that the property owners would use the trash receptacles (see Cal. Const., art. XIII D, § 6, subd. (b)(3)–(4)), the placement of the receptacles at public transit stops makes the "service available to the public at large in substantially the same manner as it is to property owners" (*id.*, art. XIII D, § 6, subd. (b)(3)). The state agencies, therefore, failed to establish that the local governments could impose on property owners adjacent to transit stops a fee that could satisfy these constitutional requirements.

In their briefs in the trial court, the state agencies relied on Health and Safety Code section 5471, but did not assert it in their respondents' brief or first supplemental brief on appeal. We requested the parties address the issue in further supplemental briefs, which we have received. Health and Safety Code section 5471, subdivision (a) provides that "any entity shall have power, by an ordinance or resolution approved by a two-thirds vote of the members of the legislative body thereof, to prescribe, revise and collect, fees, tolls, rates, rentals, or other charges for services and facilities furnished by it, either within or without its territorial limits, in connection with its water, sanitation, storm drainage, or sewerage system." The local governments do not dispute that this statute generally authorizes fees to pay for the costs of complying with the trash receptacle requirement, but correctly assert the fee or charge must also comply with constitutional limits on local government fees. (See generally Cal. Const., art. XIII D.) To the extent a fee enacted under Health and Safety Code section 5471 is imposed on transit agencies or property owners, it cannot survive scrutiny for the reasons explained above; and no cogent argument has been made as to how a fee could be imposed on pedestrians or transit riders who would be the primary users and beneficiaries of the trash receptacles.

29

The state agencies rely on an opinion of the Attorney General which concludes that "[a] city may impose storm drainage pollution abatement charges with respect to property owned by school districts within the city's boundaries to fund the city's activities in meeting federal stormwater discharge requirements if the activities do not include the construction of capital improvements." (84 Ops.Cal.Atty.Gen. 61, 61 (2001).) The Attorney General's opinion expressly assumes that a city would create "storm drainage services as a utility enterprise of the city" and pass "a resolution establishing storm drainage pollution abatement charges applicable to all parcels of property in the city, apportioned in accordance with a per-parcel runoff formula." (*Id.* at p. 62.) The opinion implies that charges for storm drainage pollution abatement can be constitutionally imposed by allocating the costs of storm drainage services among all parcels of property based on the amount of water that runs off each parcel. Without commenting on the correctness of the opinion, it is inapposite here. The state agencies are attempting to justify a fee imposed on parcels adjacent to transit stops to pay for the cost of trash collection at the transit stops. The Attorney General's opinion offers no guidance on this issue.

Lastly, the state agencies assert that the local governments have authority to levy fees to pay for the trash receptacle requirements based on Public Resources Code section 40059. Subdivision (a) of that statute provides: "Notwithstanding any other provision of law, each county, city, district, or other local governmental agency may determine all of the following: [¶] (1) Aspects of solid waste handling which are of local concern, including, but not limited to, frequency of collection, means of collection and transportation, level of services, charges and fees, and nature, location, and extent of providing solid waste handling

30

services." This statute, enacted as part of the California Integrated Waste Management Act of 1989, reserves to local governments decisions concerning waste management that are of local concern. Although such decisions include "charges and fees," this statute does not authorize local governments to impose charges and fees against persons or property without regard to the constitutional provisions discussed above.

## DISPOSITION

The judgment is reversed. The court shall vacate its order granting the state agencies' petition for writ of administrative mandamus and denying the local governments' cross-petition for writ of administrative mandamus as moot, and enter a new order denying both petitions.

The parties shall bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.

ROTHSCHILD, P. J.

We concur.

CHANEY, J.

BENDIX, J.

31